Jermaine HERRON, Appellant,

v.

The STATE of Texas.

No. 73455.

Court of Criminal Appeals of Texas,
En Banc.

Oct. 9, 2002.

Pam Guenther, Edna, for appellant.

Robert C. Lassman, Assist. DA., Cuero, Matthew Paul, State's Attorney, Austin, for state.

## OPINION

HOLCOMB, J., delivered the opinion of the Court, in which KELLER, P.J., and MEYERS, PRICE, KEASLER, HERVEY, and COCHRAN, JJ., joined.

In April of 1999, appellant, Jermaine Herron, was tried for capital murder. *See* Tex. Pen.Code § 19.03.[1] At that trial, the State presented evidence that appellant shot and killed a woman and her son in the course of committing a robbery. Pursuant to the jury's answers to the special issues set forth in Article 37.071, sections 2(b) and 2(e), the trial judge sentenced appellant to death. Appellant raises nine points of error. We affirm.

### STATEMENT OF FACTS

Although appellant does not contest the sufficiency of the evidence, a brief discussion of the relevant facts is appropriate. The evidence adduced at trial, viewed in the light most favorable to the verdict, established the following.

Ron Lucich and his family lived in a trailer home on their ranch in Refugio County. Betsy Nutt and her son, Cody, lived in a second trailer on the property. Appellant was familiar with the Luciches

---

1. Unless otherwise indicated, all references to articles refer to those in the Texas Code of Criminal Procedure.

and their ranch, because he and his father had lived on the property many years earlier when his father had been Mr. Lucich's ranch foreman.

On June 25, 1997, at approximately 11 a.m., appellant and Derrick Frazier paid a visit to the Lucich residence. The stated purpose of their visit was to see whether Mr. Lucich had any work for them. Mr. Lucich was at work, however, and only his three children were home. Appellant and Frazier decided to "hang out" for awhile.[2] Sometime during the visit, Mrs. Lucich came home. She became concerned about the presence of appellant and Frazier in her home and called her husband. Mr. Lucich told her to "get them out of there."[3] Mrs. Lucich, in a diplomatic attempt to get them to leave, took everyone out for lunch. After lunch she dropped appellant and Frazier off at the house of one of appellant's friends. During their visit to the ranch, appellant and Frazier observed a number of guns that were kept in plain view around the house. They also learned that the Luciches were planning an out-of-town day trip the next day.

That afternoon (i.e., June 25, 1997), appellant, Frazier, and Michael Brown made plans to burglarize the Lucich residence and steal the guns and Ms. Nutt's truck. At around 4 p.m., they drove to a roadside park from which the ranch could be viewed. There, they further discussed the details of the plan. At one point, appellant pointed to Ms. Nutt's truck and said, "That's my truck."

Around 9:00 p.m. that evening, Crystal Mascorro drove appellant, Frazier, and Brown to Trey Johnson's house, where appellant picked up a .22–caliber rifle. Mascorro then drove appellant, Frazier, and Brown to the entrance of the Lucich ranch and dropped them off so that they could carry out their plans. All three men were wearing bandanas on their face, and appellant was carrying the rifle. Mascorro briefly tried to talk them into abandoning their plans but ultimately left, believing that the threesome would make their way back to town by stealing Ms. Nutt's truck. Both Mascorro and Brown were under the impression that the rifle appellant had picked up from Johnson's house was broken and could not be used as a firearm. Brown was also under the impression that no one was to be at the Lucich home; however, once at the ranch, appellant started talking about killing someone. At that point, Brown felt that it was time to turn back, and when the porch light came on at the Lucich house, he ran. Frazier and appellant subsequently joined him, and they all left the ranch.

A few hours later, in the early morning hours of June 26, 1997, appellant and Frazier convinced Brown to drive them back to the Lucich ranch in order to complete the burglary. Brown left after dropping the pair off. Appellant and Frazier then hid and waited for the Luciches to leave. At around 7:30 a.m., the Luciches left. Appellant and Frazier then entered the house. After burglarizing the home, finding the guns, and gathering up everything they wanted to steal, appellant telephoned Brown and told him that he and Frazier had found some alcohol. They then positioned some chairs in front of the living room window so that they could observe the road leading up to the residence. They spent the next four to five hours sitting around, drinking, and waiting. At around 2 p.m., Ms. Nutt pulled up to her trailer in her truck. Appellant and Frazi-

---

**2.** Appellant introduced Frazier as his cousin, "Kevin." In actuality, Frazier was not his cousin, and his first name was Derrick.

**3.** Later that day, Ron called appellant and told him never to come back to his ranch.

er, who had observed Ms. Nutt pull up, then walked over to her trailer house and asked to use the phone. They told Ms. Nutt that their car had broken down. Once inside, they forced Ms. Nutt and her son to get on their knees and then shot each of them in the head twice. Shortly thereafter, appellant called Brown again and told him that he had killed a woman and a little boy. It was for those murders that appellant was tried, convicted, and sentenced to death.

## MOTION TO SUPPRESS APPELLANT'S STATEMENTS

In point of error one, appellant contends that the trial court erred in denying his motion to suppress two statements which he gave to law enforcement officers after surrendering himself for arrest. Citing *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), appellant asserts that the police violated his Fifth Amendment right to counsel when they took his statements in the absence of counsel, even though he had unequivocally asserted his right to have an attorney present. *See Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

■■■ At a suppression hearing, the trial judge is the trier of fact and assesses the witnesses' credibility and the weight to be given their testimony. *State v. Ballard,* 987 S.W.2d 889, 891 (Tex.Crim.App.1999). As long as they are supported by the record, we afford almost total deference to a trial court's findings of historical fact. *Guzman v. State,* 955 S.W.2d 85, 89 (Tex. Crim.App.1997). Furthermore, we defer to a trial court's application of law to fact rulings if they turn on an evaluation of credibility and demeanor. *Id.*

Before trial, appellant filed a motion to suppress his statements, alleging that the police had taken them in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I, Section 10, of the Texas Constitution. After a hearing, the trial court entered findings of fact and denied appellant's motion based on the following facts.

On June 29, 1997, after a warrant was issued for his arrest, appellant contacted Captain Willie Brown of the Refugio County Sheriff's Office and surrendered himself to Brown at Brown's home.[4] Brown read appellant his rights and informed him that if he had anything to say, then he needed to say it to the investigating officer and not to Brown. Brown then transported appellant to the county jail. En route to the jail, appellant told Brown that he wanted an attorney. Although Brown may have informed the sheriff at the jail of appellant's request, he did not inform either Deputy Bolcik, the local investigating officer, or Texas Ranger Oscar Rivera, who was also investigating the offense.

When Bolcik arrived at the jail, appellant was being processed. Bolcik approached appellant and asked him, "Did you want to talk to me?" Appellant answered, "Yes." Without further questioning, Bolcik took appellant to a room where Rivera was waiting. Rivera interviewed appellant on videotape with Bolcik present. Before the interview, Rivera reminded appellant that he had previously been advised of his rights, again advised appellant of his rights pursuant to Article 38.22, and provided appellant a written admonishment of his rights. After reading it, appellant signed the waiver of rights and then provided the videotaped statement. The trial court found that appellant understood his rights and knowingly, intelligently, and

---

4. Captain Brown is apparently appellant's un- cle.

voluntarily waived them and voluntarily gave the statement. The court ruled the statement admissible, but it was not introduced into evidence.

According to Bolcik, appellant saw him in the jail on July 1, 1997, and motioned for him to come over. When Bolcik got to the loor, appellant told him that "what he said on the first statement was true, but he left out something and asked if he could talk to me." Bolcik again contacted Rivera and arranged another interview. Rivera conducted the interview with Bolcik and Assistant District Attorney Terry Breen present. This interview was also videotaped. Prior to taking appellant's statement, Rivera reminded appellant that he had been previously informed of his rights at least twice. Rivera then gave appellant a printed admonishment of his rights, read the warnings to appellant, and appellant waived his rights again. Appellant testified later in the hearing and contested Bolcik's version of these events. The trial court found that the interview was initiated by appellant and that appellant knowingly, intelligently, and voluntarily waived his rights and provided the statement. The trial court concluded that the statement was admissible, and it was later introduced at trial.

In *Miranda v. Arizona*, 384 U.S. at 474, 86 S.Ct. 1602, the United States Supreme Court held that if an accused requests counsel, then all interrogation must cease until an attorney is present. The Supreme Court reaffirmed that holding in *Edwards* but further noted that an accused could waive his prior election by initiating further communication with the police. *Edwards*, 451 U.S. at 484–85, 101 S.Ct. 1880. Statements thereafter gathered through

the accused's initiation would be admissible against him at trial. *Id.*

■■■ One officer's knowledge that a defendant has requested counsel is imputed to every other state agent. *See Arizona v. Roberson*, 486 U.S. 675, 687–88, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988). The failure to convey such knowledge cannot justify the State's failure to suspend interrogations until counsel has been provided. *Id.* Thus, appellant's first videotaped statement was not admissible at trial despite the trial court's conclusion to the contrary. However, because that statement was not introduced into evidence, the trial court's error in declaring it admissible is irrelevant.

While appellant recognizes that the admissibility of his first statement is moot because it was not introduced into evidence, he argues that the inadmissible first statement induced his second statement.[5] Appellant further argues that even assuming that he initiated the second interview, the police's initial violation of his right to counsel rendered the subsequent waiver of his rights involuntary.

■■■ We agree with appellant that under *Edwards*, his assertion of the right to counsel continued past the State's initial violation of his rights and would trump subsequent waivers at police-initiated interviews. *See Edwards*, 451 U.S. at 484–85, 101 S.Ct. 1880. However, the Supreme Court in *Edwards* held:

> [A]n accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, *unless the accused himself initiates further communica-*

---

**5.** However, appellant does not cite, nor have we found, any authority in support of this argument.

*tion, exchanges, or conversations with the police.*

451 U.S. at 484–85, 101 S.Ct. 1880 (emphasis added).

■ Evidence in the record supports the trial court's finding that appellant initiated the second interview on July 1.[6] Thus, under *Edwards,* appellant waived his previously asserted right to counsel for the purposes of that interview. *Id.* In the absence of anything in the record indicating that the statement was otherwise involuntary, the trial judge acted within his discretion in ruling the statement admissible. *See, e.g., Oregon v. Elstad,* 470 U.S. 298, 310–12, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). Appellant's first point of error is overruled.

## STATE'S CHALLENGES FOR CAUSE

In points two, three, and four, appellant argues that the trial court erred in granting the State's challenges of veniremembers Dean, Balboa, and Hopes, for cause. Appellant avers that the trial court abused its discretion and violated *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), because the veniremembers asserted that in the proper case, in spite of their reservations about capital punishment, they could answer the punishment questions in such a way that a death sentence would be assessed.

■ Consistent with the Sixth Amendment guarantee of an impartial jury, a potential juror is challengeable for cause if his opinions about the death penalty would prevent or substantially impair his performance as a juror. *Rachal v. State,* 917 S.W.2d 799, 810 (Tex.Crim. App.), *cert. denied,* 519 U.S. 1043, 117 S.Ct. 614, 136 L.Ed.2d 539 (1996). A reviewing court will not upset the trial

court's ruling absent an abuse of discretion. *Id.* We examine the record as a whole to determine whether there is support for the trial court's ruling, deferring to the trial judge who was in a position to see and hear the venireperson. *Id.*

■ During questioning, the prosecutor noted that veniremember Dean had stated on her questionnaire that she was not against the death penalty. However, she had further stated that she could not vote for the death penalty "regardless of the facts and circumstances of the case." The prosecutor explained that Dean would not be required to actually sentence the defendant to "life" or "death" but, rather, would be required to answer certain questions. Dean indicated that she understood the process but because of her views, she would answer one of the questions in a way that would ensure the assessment of a life sentence.

Pursuant to defense questioning, Dean asserted that she could answer the special issues in a manner which would result in a death sentence. The State then clarified to Dean that by answering the special issues in a certain way, a death sentence could result. The prosecutor then asked her whether, knowing this, she could answer the special issues based upon the evidence presented in the case. Dean replied that, regardless of the evidence presented in the case, she would always answer one or more of the special issues in a way that would insure the assessment of a life sentence.

Because Dean vacillated in her answers and because she ultimately stated that she would answer the punishment questions based upon her own views and not necessarily upon the evidence presented, the judge acted within his discretion in grant-

---

**6.** We have reviewed the actual videotape of the July 1st interview, and on it appellant, after being warned of his rights, readily agreed that he initiated the interview.

ing the State's challenge for cause. *See Colburn v. State,* 966 S.W.2d 511, 517 (Tex. Crim.App.1998). Appellant's second point of error is overruled.

In his questionnaire, prospective juror Balboa indicated that he did not believe the death penalty should be used. However, he noted that as long as the law provided for it, he could assess the death penalty in appropriate circumstances. After further questioning, however, Balboa answered that he would, despite the evidence, vote in a manner so that a life sentence would be assessed.

During defense efforts to rehabilitate him, Balboa testified that he could not answer the mitigation special issue. After the State challenged Balboa for cause, the defense argued that Balboa's refusal to answer the mitigation question was simply an attempt to get out of serving on the jury.

Given Balboa's unwillingness or inability to consider all of the punishment questions, as well as his sometimes-contradictory statements, we cannot say that the trial court abused its discretion in granting the State's challenge for cause. Appellant's third point of error is overruled.

Veniremember Hopes testified initially that, due to her convictions, she would always answer the punishment questions in such a way that a life sentence would result. The defense reviewed the special issues with her in more detail and then asked Hopes whether, having taken an oath as a juror, she would do what the law required and answer the special issues according to the evidence or whether she would disregard the evidence and vote for a life sentence because of her convictions. Hopes responded that she could answer the punishment questions based upon the evidence.

When the prosecutor attempted to clarify the inconsistencies in her responses, Hopes returned to the position that she could not vote for the death penalty under any circumstances. Hopes changed her position twice more when re-questioned by the defense and questioned one last time by the State. Because Hopes vacillated in her answers, the judge acted within his discretion in granting the State's challenge for cause. *See Colburn,* 966 S.W.2d at 517. Appellant's fourth point of error is overruled.

## BATSON

In his fifth point of error, appellant contends that the trial court erred in overruling his *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), objection to the State's peremptory challenge of veniremember Garley. Using peremptory challenges to exclude persons from a jury because of their race violates the equal protection clause of the Fourteenth Amendment. *Ladd v. State,* 3 S.W.3d 547, 563 (Tex.Crim.App.1999), *cert. denied,* 529 U.S. 1070, 120 S.Ct. 1680, 146 L.Ed.2d 487 (2000). The party objecting under *Batson* must make a *prima facie* showing of discriminatory motives. *Id.* If the objecting party makes a *prima facie* showing, then the burden of production shifts to the other party to come forward with a race-neutral explanation. *Id.* The objecting party may rebut the race-neutral explanation. *Id.* The trial court must then decide whether the objecting party has proven purposeful discrimination. *Id.* Because the trial court's decision often turns largely on an evaluation of credibility, we give the court's decision great deference and will not disturb it unless it is clearly erroneous. *Id.*

After appellant objected in the instant case, the State offered its race-neutral explanation for striking Garley. The

State explained that it had discovered through an out-of-court investigation that Garley had a reputation at her workplace for being stubborn and close-minded and that she had confrontations with her supervisors and co-workers. An investigator with the sheriff's office who knew Garley advised the State that she "ha[d] a chip on her shoulder," that she would likely let race influence her verdict, and that she was not someone they wanted on the jury. The prosecutor also informed the judge that the father of Garley's children had an extensive criminal record. In fact, Garley had been investigated for assaulting that man. Finally, the prosecutor explained that Garley apparently had numerous domestic relations problems which indicated a level of instability in her life.

Appellant argued in response that the background investigation was an extraordinary measure and evidenced the State's willingness to go to any length to ensure that African–Americans would not serve on the jury. The prosecutor responded that they had likewise investigated nearly half of the other veniremembers regardless of race.

Because the State offered race-neutral motives for its strike, and appellant failed to rebut those motives, we hold that the trial court did not clearly err in allowing the State's challenge to Garley. Appellant's fifth point of error is overruled.

## ACCOMPLICE–WITNESS INSTRUCTIONS

In points of error six and seven, appellant contends the trial court erred when it refused his request for Article 38.14 accomplice-witness instructions regarding Crystal Mascorro and Michael Brown. An accomplice is one who participates in an offense, before, during, or after its commission, to the extent that he can be charged with the offense or with a lesser-included offense. *Blake v. State*, 971 S.W.2d 451, 454–455 (Tex.Crim.App. 1998). A prosecution witness who is indicted for the same offense with which the defendant is charged is an accomplice as a matter of law. *Ex parte Zepeda*, 819 S.W.2d 874, 876 (Tex.Crim.App.1991). In addition, a prosecution witness "who is indicted for a lesser included offense based upon alleged participation in commission of the greater offense is also an accomplice as a matter of law." *Id.* If a prosecution witness is an accomplice as a matter of law, the trial court is under a duty to instruct the jury accordingly. *Blake*, 971 S.W.2d at 455. Failure to do so is error.

Here, appellant was indicted for, among other things, murdering Betsy Nutt and her son in the course of burglarizing the Lucich residence and for murdering Betsy Nutt and her son in the course of robbing Betsy Nutt. Both Mascorro and Brown testified that they were indicted for burglary (of the Lucich residence) and aggravated robbery (of Betsy Nutt) for their participation in the criminal transaction giving rise to appellant's capital murder indictment. Because they were indicted for lesser included offenses based upon their alleged participation in the commission of the greater offense, both were accomplices as a matter of law, and the trial judge should have instructed the jury to that effect. *Zepeda*, 819 S.W.2d at 876. Failure to do so was error.

Next, we must consider whether the error was harmful. Answering this question requires us to examine the effect an accomplice witness instruction has on the trial. The instruction, set out in Article 38.14, provides:

A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense

committed; and the corroboration is not sufficient if it merely shows the commission of the offense.

The instruction does not say that the jury should be skeptical of accomplice witness testimony. Nor does it provide for the jury to give less weight to such testimony than to other evidence. The instruction merely informs the jury that it cannot use the accomplice witness testimony unless there is also some non-accomplice evidence connecting the defendant to the offense. Once it is determined that such non-accomplice evidence exists, the purpose of the instruction is fulfilled, and the instruction plays no further role in the factfinder's decision-making. Therefore, non-accomplice evidence can render harmless a failure to submit an accomplice witness instruction by fulfilling the purpose an accomplice witness instruction is designed to serve.

Prior to 1991, we recognized three situations where error in failing to give an accomplice witness instruction was harmful: (1) the witness is in fact an accomplice and there is no evidence to corroborate his testimony, (2) the non-accomplice evidence is insufficient as a matter of law to support the conviction, and (3) the accomplice witness provides testimony which is the only corroboration for another accomplice witness. *Saunders v. State,* 817 S.W.2d 688, 689 (Tex.Crim.App.1991). In *Saunders* we disavowed this approach as unnecessarily rigid. We indicated that a harmless error analysis for the omission of an accomplice witness instruction should be flexible, taking into account the existence and strength of any non-accomplice evidence and the applicable standard of harm.

[A]ll harmless error applications, including that prescribed by *Almanza,* are essentially empirical inquiries concerning the effect of flaws and mistakes on the particular strengths and weaknesses of individual cases.

*Id.* at 690.

■■■■ In determining the strength of a particular item of non-accomplice evidence, we examine (1) its reliability or believability and (2) the strength of its tendency to connect the defendant to the crime. Under *Almanza v. State,* 686 S.W.2d at 157 (Tex.Crim.App.1984), the appropriate harm analysis depends upon whether the defendant preserved error by bringing the improper omission to the trial court's attention. When the error is properly preserved, a reversal is required if "some harm" is shown. But when the defendant has failed to preserve error, he must show egregious harm. The difference in harm standards impacts how strong the non-accomplice evidence must be for the error in omitting an accomplice witness instruction to be considered harmless.

■■■■ Under the egregious harm standard, the omission of an accomplice witness instruction is generally harmless unless the corroborating (non-accomplice) evidence is "so unconvincing in fact as to render the State's overall case for conviction clearly and significantly less persuasive." *Saunders,* 817 S.W.2d at 692. In *Saunders,* there was harm under this standard because the corroborating non-accomplice evidence was weak and was contradicted by other evidence. The alleged crime was arson and the corroborating evidence involved financial circumstances that seemed somewhat suspicious at first glance but were given persuasive innocent explanations. As a result, the corroborating evidence, even if believed, did not have a very strong tendency to connect the defendant to the crime. Furthermore, much of the evidence in the defendant's favor was uncontradicted, and we observed that "[r]ational jurors may

not utterly disregard undisputed evidence without a sensible basis for thinking it unreliable any more than they may simply assume a critical part of the proof without evidence having an inclination to confirm it." *Id.* at 693.

We have not as clearly addressed this type of error in the "some" harm context. Obviously, all other things being equal, the non-accomplice evidence would have to be stronger than what is required in the egregious harm context. In *Burns v. State*, 703 S.W.2d 649, 652 (Tex.Crim.App.1985), we found error harmful under the "some harm" standard where the witness was an accomplice as a matter of law, the accomplice witness testimony was corroborated only by the defendant's confession and fruits of that confession, and the defendant was challenging the voluntariness of his confession. We reasoned that, if the jury found the confession to be involuntary, then the confession and its fruits would be disregarded, and the accomplice testimony would then be uncorroborated. *Burns* relied upon the pre-*Almanza* approach disavowed in *Saunders*, but much of its reasoning is still valid. After *Saunders*, though, the voluntariness challenge to the confession would be relevant, but not by itself determinative; if the voluntariness challenge were especially weak, or some other factor mitigating against harm were present, the confession might still be considered sufficient corroborating evidence to render the accomplice witness charge error harmless.

In *Medina v. State*, 7 S.W.3d 633 (Tex. Crim.App.1999) we found error harmless under the "some harm" standard where there was a substantial amount of non-accomplice evidence and the evidence of the witness's accomplice status was tenuous (barely enough to support submission as an accomplice as a matter of fact). The non-accomplice evidence consisted of eye-witness testimony identifying the defendant as the shooter and the defendant's own incriminating statements to non-law enforcement witnesses. Although it was theoretically possible for the jury to (1) believe that the alleged accomplice was in fact an accomplice, (2) believe this person's testimony, and (3) disbelieve two other witnesses, we held that the some harm test was not satisfied by that possibility.

 It appears from these authorities that the reliability inquiry may be satisfied if: (1) there is non-accomplice evidence, and (2) there is no rational and articulable basis for disregarding the non-accomplice evidence or finding that it fails to connect the defendant to the offense. In *Burns*, for example, the voluntariness challenge provided a rational and articulable basis for disregarding the fruits of the confession. Of course, even with a rational and articulable basis for disregarding the corroborating evidence, other factors may affect the harm analysis—as in *Medina*, where the weakness of the evidence of accomplice status, combined with the significant non-accomplice evidence, rendered the error harmless.

In the present case, the non-accomplice evidence consisted of: (1) appellant's confession, (2) appellant's clothes found at the crime scene, (3) stolen property found in appellant's possession, (4) the murder weapon found in appellant's possession, and (5) appellant's fingerprints found on several items within the victim's truck. While there may be a rational and articulable basis for disregarding the confession (due to the voluntariness challenge), there is no such basis in the record for doubting the reliability of the remaining four items of non-accomplice evidence. Moreover, these four pieces of circumstantial evidence clearly connect appellant to the offense. There is no persuasive innocent explanation for the presence of appellant's

clothes and fingerprints at the scene, or for his possession of stolen property and the murder weapon. For these reasons, we hold that the charge error was harmless.

## EFFECTIVE ASSISTANCE OF COUNSEL

 Appellant avers in his eighth and ninth points of error that trial counsel was ineffective. *See Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Under the *Strickland* analysis, an appellant must first show that counsel's performance was deficient, *i.e.,* that it fell below an objective standard of reasonableness. *Id.* at 687, 104 S.Ct. 2052. There is a strong presumption that counsel's actions fell within the wide range of reasonable professional assistance. *Id.* at 689, 104 S.Ct. 2052. Even if counsel's performance was deficient, applicant must demonstrate a reasonable probability that, but for that deficiency, the outcome would have been different. *Id.* at 687, 104 S.Ct. 2052. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceedings. *Hernandez v. State,* 726 S.W.2d 53, 55 (Tex.Crim. App.1986).

 In point of error eight, appellant alleges that trial counsel's performance was deficient because he failed to object when the State elicited portions of Derrick Frazier's confession which detailed appellant's participation in the murder. Appellant argues that the admission of Frazier's hearsay statement violated his Sixth Amendment right to confrontation and undermines confidence in the result of his trial. *See Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

In the instant case, the defense attempted to establish that Officer Bolcik fabricated both appellant's and Frazier's confes-

sions by dictating to the defendants what their confessions would say. The defense questioned Rivera about the progressive changes in appellant's and Frazier's statements under Rivera's influence. Appellant later testified that Officer Bolcik had told him that Frazier had asserted in his statement that appellant had shot Cody Nutt, and that Frazier was blaming appellant for the murders. Appellant testified that Bolcik had dictated to him what his statement should say if he wanted to avoid the death penalty.

One can reasonably conclude from the manner in which defense counsel cross-examined the State's witnesses and the substance of appellant's own testimony, that defense counsel decided, as a matter of trial strategy, to use Frazier's statement to further appellant's defense. Thus, appellant has failed to prove that his counsel's performance was deficient. Appellant's eighth point of error is overruled.

 In his ninth point of error, appellant argues that trial counsel denied him effective assistance of counsel by failing to request an Article 38.23 instruction on the "legality of [his] confession." Appellant argues that his testimony raised factual questions about whether he requested counsel on June 29 and whether he had initiated the interview on July 1. However, appellant has failed to argue how counsel's alleged deficiency prejudiced him and undermined the reliability of his trial. That failure precludes any relief. *Ladd v. State,* 3 S.W.3d 547, 570 (Tex.Crim.App.1999), *cert. denied,* 529 U.S. 1070, 120 S.Ct. 1680, 146 L.Ed.2d 487 (2000). Appellant's ninth point of error is overruled.

The judgment of the trial court is affirmed.

WOMACK, J., filed a dissenting opinion, in which JOHNSON, J., joined.

WOMACK, J., filed a dissenting opinion, in which JOHNSON, J., joined.

The ninth point of error is that the appellant was denied effective assistance of counsel when his counsel failed to request a jury charge on the "legality of his confession." The Court holds that we need not consider the merits of this point because the appellant "has failed to argue how this prejudiced him." *Ante* at 633. It seems obvious that if such an instruction had been given and the jury disregarded the confession, the evidence of guilt would have been significantly weaker. As the Court points out, the evidence that corroborated the accomplice witnesses was "primarily his own videotaped confession." *Ante* at 632.

Such a jury charge on the confession also figures in the points of error about the trial court's refusal to give a charge on the law of accomplice-witness evidence. It is unquestioned that the trial court erred by denying the appellant's request for such a charge. The Court points out that there was a good bit of corroborating evidence, primarily the confession. It also sets out the rule of law that, when the error is giving a charge on accomplice-as-a-matter of fact when the charge should have been accomplice-as-matter-of-law, the error is harmless when there was a good bit of accomplice evidence. *Ante* at 631. That is correct but irrelevant, since the error in this case was not giving the wrong kind of charge; it was giving no charge at all.

The Court says the "same analysis applies." *Ante* at 631. It cites no authority for this statement. The obvious difference between these errors is that, if the jury is charged on the law of accomplice-as-a-matter-of-fact and they apply the law correctly, they will reach the right result so long as there was sufficient corroborating evidence. But if there was no charge at all on the law of accomplice-witnesses, there is no chance that the jury could have applied the law correctly.

In *Saunders v. State*, 817 S.W.2d 688 (Tex.Cr.App.1991), the *unobjected-to* failure to charge on accomplice witness law was reversible error, that is, egregious error. In that case we held that the "good-bit-of-corroborating-evidence" test for harm was "defunct." *Saunders* is a strong indication that the "good-bit of corroboration" test that the Court uses today does not apply in that way in a case in which the trial court gave no charge at all on accomplice-witness evidence.

Although the corroborating evidence in *Saunders* included a confession, we pointed out that the court's charge included an instruction to disregard the confession if the jury did not find that it was voluntary. The jury might well have done this, so there the confession could not be given much weight as corroborating evidence. The case now before us is one in which the appellant complains of the absence of such a jury instruction about the voluntariness of the confession.

I am not sure that the Court is wrong to overrule these points of error, but I am sure that it should not do so without finding and applying the correct test for harmless error.

I respectfully dissent to an affirmance of the judgment in this fashion.