NO. 07-03-0164-CV



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL E



JUNE 23, 2003


______________________________



IN RE: C.C.S.


 

 ______________________________ 
 _________________________________


 

FROM THE COUNTY COURT OF LUBBOCK COUNTY;



NO. 2003-786,556; HON. PAULA LANEHART, PRESIDING


_______________________________





Opinion


_______________________________




Before QUINN and REAVIS, JJ., and BOYD, S.J. (1)

 Appellant C.C.S. appeals from an order involuntarily committing her for 90 days to
the Sunrise Canyon Hospital in Lubbock and from an order permitting the involuntary
administration of psychoactive medication. In presenting her appeal, she contends that 
1) the evidence was legally insufficient to satisfy the statutory requirements for
commitment, and 2) because there was no valid order for commitment, the trial court erred
in ordering the administration of psychoactive medication. We affirm the orders.

 


Background


 An application for emergency detention and temporary mental health services was
filed by C.C.S.'s mother on the basis that she evidenced mental illness and a substantial
risk of serious harm to herself or others. The petitioner so alleged because C.C.S. had
stated that she, her husband, and her four children were going to the kingdom of God or
of Heaven at the end of the month and she had sold all of her family's possessions and
held her children out of school for the past year. An application was also filed for an order
to administer to her psychoactive medication. On March 19, 2003, a hearing was held
before the trial court on both applications, after which the court executed the requested
orders. 

 Issue One - Sufficiency of the Evidence

 In her first issue, C.C.S. argues that there is legally insufficient evidence (or no
evidence) to sustain the order of involuntary confinement. We overrule the issue.

 Standard of Review

 The standard by which we review a legal sufficiency claim is well known, and rather
than restate it, we cite the parties to Continental Coffee Products Co. v. Cazarez, 937
S.W.2d 444, 450 (Tex. 1996), In re K.C.M., 4 S.W.3d 392, 395 (Tex. App.--Houston [1st
Dist.] 1999, pet. denied), overruled in part on other grounds, In re C.H., 89 S.W.3d 17
(Tex. 2002), and In re K.D.C., 78 S.W.3d 543, 546 (Tex. App.--Amarillo 2002, no pet.) for
its explanation.

 Next, a trial court may order the commitment of a person to a temporary inpatient
mental health service if it or a jury finds from clear and convincing evidence that:

 1) the proposed patient is mentally ill; and 

 

 2) as a result of that mental illness the proposed patient:


 (A) is likely to cause serious harm to himself;


 (B) is likely to cause serious harm to others; or


 (C) is:


 (i) suffering severe and abnormal mental, emotional,

 or physical distress;


 (ii) experiencing substantial mental or physical deterioration of
the proposed patient's ability to function independently, which
is exhibited by the proposed patient's inability, except for
reasons of indigence, to provide for the proposed patient's
basic needs, including food, clothing, health, or safety; and


 (iii) unable to make a rational and informed decision as to
whether or not to submit to treatment. 


Tex. Health & Safety Code Ann. §574.034(a) (Vernon 2003). From this, we see that the
trial court may order one to be involuntarily committed for 90 days if the person suffers a
mental illness and either the terms of §574.034(a)(2)(A) or (B) or (C) are satisfied. Not all
must be satisfied. 

 Next, to be clear and convincing, the evidence must include expert testimony and,
unless waived, evidence of a recent overt act or a continuing pattern of behavior that tends
to confirm 1) the likelihood of serious harm to the proposed patient or others or 2) the
proposed patient's distress and deterioration of the ability to function. Id. §574.034(d). 
So too must it be enough to permit a factfinder to reasonably form a firm belief or
conviction about the truth of the State's allegations. See In re C.H., 89 S.W.3d at 25.

 At bar, the trial court found that C.C.S. is mentally ill and, as a result, is likely to
cause serious harm to herself or others. So too did it conclude that she is suffering
distress, is experiencing substantial mental or physical deterioration of her ability to
function independently, and is unable to make a rational and informed decision as to
whether to submit to treatment. Though C.C.S. disagrees with all these findings, her
attack upon that involving the existence of a mental illness constitutes nothing more than
the statement (appearing within parentheses) that she "has not been proven [mentally ill]
in this case." No argument, analysis, or citation to either the record or authority
accompanies the passage. Consequently, any complaint she had with regard to it is
waived, see Dunlap v. Excel Corp., 30 S.W.3d 427, 434 (Tex. App.-Amarillo 2000, no pet.)
(holding that substantive analysis and citation to authority must accompany an issue to
avoid waiver), and we address only whether sufficient evidence appears of record to
satisfy the requirements of §574.034(a)(2)(A) or (B) or (C). 

 Evidence

 Viewing the record in a light most favorable to the decision of the trial court (as we
must under In re C.H.), we find that the record contains the following evidence. C.C.S.
believes herself to be "King Cyrus" and the daughter of God (or the female counterpart to
Jesus Christ). So believing, she began disposing of earthly possessions in preparation
for her family's journey to the Kingdom of God or Heaven. Furthermore, this kingdom was
not of this earth but of another realm, C.C.S. informed others. Moreover, she told her
mother that she (C.C.S.) and her four children were soon to go to that kingdom; at one
point she uttered that it would be "at the end of [the] month." This led to her disposition
of the aforementioned possessions. The latter included not only her clothes and the family
computer but also the clothes and winter coats of her children, family pictures, and
children's sport trophies. (2) Her preparation also involved the removal of her four school
aged children from school. (3) Indeed, prior to the transfer of their custody to their
grandparents (via court order issued within a month of the commitment trial), the four
children had been absent from school for approximately seven months. 

 Also appearing of record is evidence that one of the four children developed a
cavity "so severe that it went into the roots" of the tooth. This condition existed for
"probably eight to nine months" before the child was taken to a dentist. The individual who
eventually took the child to the dentist was not C.C.S., but her brother. C.C.S. did not do
so, according to her brother, since she "didn't believe in doctors." Instead, she opted to
treat the cavity by "put[ting] vinegar on it." 

 Intentionally selling the clothes of one's child (especially winter coats in the North
Panhandle region of Texas where winters often get cold), depriving them of medical care,
denying them an education, and uttering that the children will soon be journeying to the
Kingdom of God is some evidence upon which a factfinder could reasonably form a firm
belief or conviction about the truth of the State's allegations. It is some evidence on which
a factfinder could reasonably form a firm belief or conviction that C.C.S.'s mental illness
was likely to cause serious harm to others per §574.034(a)(2)(B) of the Texas Health and
Safety Code. Moreover, these acts were overt and recent and tended to confirm the
likelihood of serious harm to others, as required by §574.034(d). That C.C.S.'s parents
were granted custody shortly before trial does not change this for several reasons. First,
the extent and duration of that grant was not explained. So, nothing of record indicates
that she will not have access to them. On the contrary, evidence appears of record
illustrating that she and her husband were to have access to their offspring via supervised
visits. Moreover, those visits are supervised, according to C.C.S., because she voiced that
she (and her husband) "might try to take them and take them away and get out of this
place, and get away . . . ." In short, evidence appears of record suggesting that she may
still pose a threat to them even though they are in the custody of others.

Issue Two


 Via her second and final issue, C.C.S. contends that the trial court erred in ordering
the administration of psychoactive medication because there was no evidence supporting
her temporary commitment to a mental health facility. That is, she solely based the
success of her second issue upon the success of her first. Because we overruled the first,
the foundation underlying her second is non-existent. Thus, we overrule it as well. 

 Having overruled both issues raised by C.C.S., we affirm the order of the trial court.


 Brian Quinn

 Justice 

 

1. John T. Boyd, Chief Justice (Ret.), Seventh Court of Appeals, sitting by assignment. Tex. Gov't
Code Ann. §75.002(a)(1) (Vernon Supp. 2003). 
2. The family pictures and those of her children were believed by her to be forms of idolatry.
3. The children apparently ranged in age from ten to 16

 at the time of their removal from school. And, though C.C.S. mentioned that she desired to home-school
them, she did not do so.


ess
merely because he or she knew of the offense and did not
disclose it, or even if he or she concealed it. In addition, the
witness’s mere presence at the scene of the crime does not
render that witness an accomplice witness. And complicity
with an accused in the commission of another offense apart
from the charged offense does not make that witness’s
testimony that of an accomplice witness. 
 
Druery v. State, 225 S.W.3d 491, 498 (Tex.Crim.App. 2007) (footnotes and citations
omitted). A witness is an accomplice if she could be prosecuted for the same offense as
the defendant or a lesser included offense. Blake v. State, 971 S.W.2d 451, 454-55
(Tex.Crim.App. 1998). This means a witness is an accomplice if the evidence so connects
her to the crime that she is a “blameworthy participant.” Id. “Whether the person is
actually charged and prosecuted for their participation is irrelevant to the determination of
accomplice status - - what matters is the evidence in the record.” Id. at 455. The
testimony of an accomplice is considered untrustworthy and should be “received and
viewed and acted on with caution.” Walker v. State, 615 S.W.2d 728, 731 (Tex.Crim.App.
1981). Thus, “before a conviction may rest upon an accomplice witness’s testimony, that
testimony must be corroborated by independent evidence tending to connect the accused
with the crime.” Druery, 225 S.W.3d at 498; see Tex. Code of Crim. Proc. Ann. art. 38.14
(Vernon 2005).



          Once an accomplice testifies, it is for the jury to determine if the testimony was
sufficiently corroborated. Blake, 971 S.W.2d at 455. If the evidence establishes as a
matter of law the witness is an accomplice, the court must instruct the jury accordingly. 
Gamez v. State, 737 S.W.2d 315, 322 (Tex.Crim.App. 1987). But if the parties present
conflicting or unclear evidence as to whether a witness is an accomplice, the jury must
initially determine, on instruction, whether the witness is an accomplice as a matter of fact. 
Cocke v. State, 201 S.W.3d 744, 748 (Tex.Crim.App. 2006); Blake, 971 S.W.2d at 455. 
          Appellant requested an instruction that Yzaguirre was an accomplice witness as a
matter of fact and objected at the trial court’s refusal to include the instruction in its charge
to the jury. “It is well settled that an accused has a right to an instruction on any defensive
issue raised by the evidence, whether that evidence is weak or strong, unimpeached or
contradicted, and regardless of what the trial court may or may not think about the
credibility of the evidence.” Granger v. State, 3 S.W.3d 36, 38 (Tex.Crim.App. 1999). 
When the evidence raises a question of fact concerning whether or not the witness is an
accomplice, the trial court should instruct the jurors to resolve the fact issue. Kunkle v.
State, 771 S.W.2d 435, 439 (Tex.Crim.App.1986). 
          Appellant was indicted for the offense of aggravated robbery. A person commits
robbery if, in the course of committing theft and with intent to obtain or maintain control of
the property, the person (1) intentionally, knowingly, or recklessly causes bodily injury to
another or (2) intentionally or knowingly threatens or places another in fear of imminent
bodily injury or death. See Tex. Penal Code Ann. § 29.02(a) (Vernon 2003). The offense
becomes aggravated if the person uses or exhibits a deadly weapon. See id. § 29.03(a)(2)
(Vernon 2003). “A person is criminally responsible as a party to an offense if the offense
is committed by his own conduct, by the conduct of another for which he is criminally
responsible, or by both.” Tex. Penal Code Ann. § 7.01(a) (Vernon 2003). A person is
criminally responsible for the offense committed by another if, acting with intent to promote
or assist the commission of the offense, the person solicits, encourages, directs, aids, or
attempts to aid the other person’s commission of the offense. See Tex. Penal Code Ann.
§ 7.02(a)(2) (Vernon 2003). 
          To resolve the question whether Yzaguirre could have been charged as a party, we
look to the evidence. No one denies that by purchasing masks for appellant at his request
Yzaguirre aided or attempted to aid the commission of the robbery. The question is
whether she possessed the requisite intent to be charged as a party, that is, whether she
acted with the intent to promote or assist the commission of the offense. Intent is a
question of fact that the jury determines from all the circumstances. See Smith v. State,
965 S.W.2d 509, 518 (Tex.Crim.App. 1998).
          The evidence of intent was conflicting. Yzaguirre testified appellant told her that he
and his uncle planned to go hunting, and she disclaimed knowledge that appellant
intended to use the masks for any other purpose. Morado also denied his wife had prior
knowledge of the robbery and the purpose of the masks. On the other hand, evidence
abounded of criminal activity by the inhabitants of appellant’s apartment. The prosecutor
informed the court before trial began that she believed the Whataburger robbery was
committed to obtain drug money for the inhabitants of the apartment. Despite the common
use of illegal drugs by those living at the apartment, only Vargas was gainfully employed. 
Vargas testified she gave stolen credit cards to Yzaguirre and Morado. The credit cards
were used to purchase gas for cars belonging to Morado, Vargas, and appellant. 
According to Morado, the cards also were used at gas stations to purchase fuel which was
sold to third parties at half-price for cash. After moving into appellant’s apartment, Morado
began stealing to repay appellant for living accommodations. The State introduced
numerous photographs taken by police in the apartment, showing drugs, drug
paraphernalia and stolen property.


 
          Yzaguirre bought the masks four days before the robbery. She testified appellant
gave her money, asking her to purchase two hunting masks. Appellant allowed Yzaguirre
use of his car for the errand. To fulfill appellant’s request, Yzaguirre went to several retail
stores before locating and purchasing the ski-style camouflage masks at a Wal-Mart. 
Yzaguirre placed such a priority on fulfilling appellant’s request that she forsook attending
a relative’s birthday party. 
          Yzaguirre testified appellant and Morado usually carried guns when they left the
apartment. One night after Yzaguirre purchased the masks, appellant and Morado left the
apartment armed with black guns. They took with them a folding chair bag but it did not
contain a chair. Yzaguirre “figured” appellant put the masks she purchased for him in the
folding chair bag. 
          The jury might have believed Yzaguirre innocently accomplished no more than an
errand for a friend who allowed her, her daughter, and Morado to live rent-free at his
residence. But it might, conversely, have doubted her story that the ski-style camouflage
masks she bought in September were intended for hunting, and believed Yzaguirre
intentionally assisted Morado and appellant obtain money by robbery to support the
occupants of appellant’s apartment. In its charge, the court instructed the jury on the law
of parties but declined over objection to instruct on the issue of Yzaguirre as an accomplice
as a matter of fact. By omitting accomplice as a matter of fact instructions as to Yzaguirre,
the trial court erred.
            We must now consider whether the error was harmless. A court’s failure to submit
an accomplice as a matter of fact instruction may amount to harmless error if some non-accomplice evidence exists tending to connect the accused to the offense. Herron v.
State, 86 S.W.3d 621, 632 (Tex.Crim.App. 2002). Under such circumstances the omission
of the instruction is harmless because its purpose has been fulfilled. Id. “[A] harmless
error analysis for the omission of an accomplice witness instruction should be flexible,
taking into account the existence and strength of any non-accomplice evidence and the
applicable standard of review.” Id. Because appellant properly preserved his claim of error
by timely calling to the trial court’s attention the omission of an accomplice in fact
instruction pertaining to Yzaguirre, we review the error to determine if “some” harm resulted
from the omission. Almanza v. State, 686 S.W.2d 157, 171 (Tex.Crim.App. 1984) (op. on
reh’g). Cases involving preserved charge error are to be affirmed only if no harm has
occurred. Arline v. State, 721 S.W.2d 348, 351 (Tex.Crim.App. 1986) (emphasis in
original). 
          The sufficiency of corroborating evidence is tested by eliminating the accomplice
witness testimony and then examining the remaining evidence to determine the existence
or not of evidence connecting the defendant with the commission of the offense. Munoz
v. State, 853 S.W.2d 558, 559 (Tex.Crim.App. 1993). It is not necessary that the
remaining evidence directly link the defendant to the crime or prove all the elements of the
charged offense. Gill v. State, 873 S.W.2d 45, 48 (Tex.Crim.App. 1994). There is no
precise rule as to the amount of evidence that is required, and each case is to be
considered on its own facts and circumstances. Id.; Munoz, 853 S.W.2d at 559. In
reviewing the strength of the corroborating evidence, we “examine (1) its reliability or
believability and (2) the strength of its tendency to connect the defendant to the crime.” 
Herron, 86 S.W.3d at 632. The testimony of one accomplice may not corroborate the
testimony of another accomplice. See Chapman v. State, 470 S.W.2d 656, 660
(Tex.Crim.App. 1971). 
          Among the corroborating evidence was the testimony of the Whataburger employee
on duty at the time of the robbery, who described the masks worn by the robbers as “like
a mask from Wal-Mart,” with large eye openings. He observed one robber attempted to
empty the contents of a cash register drawer into the “duffle bag looking thing.” The taller
robber dropped his handgun. The employee assumed the weapon ejected a shell which
was the unspent .380 caliber shell later found on the restaurant floor. 
          According to the Whataburger manager, the eye openings of the masks resembled
“an eight lying down.” He was within three feet of a robber and observed his eyes,
eyebrows and upper cheekbones. The manager described this suspect as Hispanic, about
5’ 7’’ weighing 150-160 pounds, with dark eyes, dark eyebrows and light skin. He was
armed with what the manager believed was a black nine-millimeter. The manager agreed
the robber and appellant had “similar” features. But the manager could not identify
appellant as the robber. 
          According to Vargas, at times appellant and Morado borrowed her car after midnight
and remained away from the apartment for hours. After these outings, Vargas found the
interior decorations of her car stowed in the glove compartment. On one occasion, Vargas
found a box of latex gloves in her car. 
          Vargas lived in appellant’s apartment about two months, from the end of July into
September. During this time she observed appellant carrying two different handguns. One
was silver and the other black. On “some” occasions when appellant left at night in her car
he was armed with one of the handguns. 
          After the robbery, Vargas overheard an undisclosed conversation involving
Yzaguirre. Responding to a question from Vargas, Yzaguirre threw a newspaper at her
containing a report of the robbery. Morado was able to loan Vargas change for buying
beer. According to Vargas, she then “put two and two together.” 
          Some three weeks after the robbery, a Lubbock police detective went to appellant’s
apartment. She was told appellant had been evicted, but heard loud music coming from
within and gained admission from the manager. Inside were appellant and others whom
she arrested for criminal trespass. 
          When the detective conducted a sweep search of appellant’s apartment she
encountered Christina Ortiz, also an occupant of appellant’s apartment, lying on the bed
in appellant’s bedroom. Under a blanket on the bed, the detective found a .40 caliber
Beretta handgun. Initially the weapon was erroneously identified as a nine-millimeter. 
Other weapons were found in the apartment but the collection did not include a nine-millimeter or a .380 caliber handgun. In the livingroom of the apartment, located in a
goblet, the detective found a .380 caliber shell. It and the .380 caliber shell found at the
robbery scene were submitted to the Department of Public Safety crime laboratory for
analysis. 
          About a week after the initial search, the detective received word that the
management of the apartment complex where appellant lived was removing the contents
of his apartment. On arrival at the apartment, the detective observed appellant placing
items in his car. She arrested appellant on an outstanding misdemeanor warrant. In a bag
placed in appellant’s vehicle by Christina Ortiz, the detective found a .45 caliber handgun. 
To empty the contents of appellant’s apartment, maintenance workers for the landlord
entered and placed items of personal property in plastic trash bags. The bags were then
set on the lawn of the apartment complex. Following an inquiry of the detective, the
assistant apartment manager found camouflage masks in one of the trash bags. The
masks were admitted into evidence at trial and on recall the Whataburger manager agreed
that they appeared to be the same masks worn by the robbers. The detective testified that
she was informed the masks were stored in a “camp chair bag.” At the time of appellant’s
eviction, she found a bag fitting this description, but was unable to say whether it was
located in appellant’s bedroom or on the apartment complex lawn. 
          The State’s crime laboratory analyst testified that a Beretta nine-millimeter pistol and
.40 caliber pistol appear virtually identical. He compared the .380 caliber shell found at the
robbery scene with the .380 caliber shell the detective found in appellant’s apartment. The
bullets shared a common manufacturer, Remington, but the DPS analyst agreed on cross-examination that probably “tens of thousands” of .380 caliber shells were available for
resale in Lubbock. 
          A Lubbock police officer made comparisons of the fingerprint found at the robbery
scene with exemplars of appellant and Morado. The print matched neither. The officer
was unable to obtain a print from two handguns found at appellant’s apartment. 
          The State’s final piece of evidence was an excerpt from a recorded jail telephone
conversation between appellant and Christina Ortiz. In closing argument, the State
highlighted an excerpt that it and appellant interpret, “I’m not going to do 99 years because
some f------ m—---------- can’t hold onto his s---.” According to the State, this was an
inculpatory statement in response to Morado’s confession. And the vernacular paralleled
that used by one of the robbers. 
          Evaluating this body of non-accomplice evidence under the standard prescribed in
Herron, 865 S.W.3d at 632, we find it does not tend to connect appellant to the robbery.
Apart from the testimony of Yzaguirre and Morado, the pillars of the State’s proof are the
masks and the identification testimony of the Whataburger manager. He observed a
similarity of facial features between appellant and the shorter robber. But he was unable
to identify appellant as a robber. This leaves the masks. 
          In Munoz, 853 S.W.2d 558, the only non-accomplice testimony connecting the
accused to the murder of a convenience store clerk was the wrapper of a “Bic” lighter found
in the accused’s vehicle. The store where the clerk was killed stocked Bic lighters but the
manager could not identify the wrapper in evidence as coming from the store. Id. at 561-52. This was held insufficient corroborative evidence. Id. at 564. Here, without
Yzaguirre’s testimony, the masks are tied to appellant only by their location at the
apartment Morado, the confessed robber, also occupied. But nothing shows the trash bag
containing the masks held only appellant’s property. Like in Munoz, we find that insufficient
corroboration. 
          Finding the evidence did not fulfill the purpose of the missing accomplice in fact
instruction as to Yzaguirre, we cannot say its absence was harmless. Appellant suffered
some harm from its omission. Herron, 86 S.W.3d at 632. We sustain appellant’s second
issue. 
          Finding appellant’s second issue dispositive of the appeal, we do not address his
remaining issues. Tex. R. App. P. 47.1. We reverse the trial court’s judgment and remand
the case for a new trial.
James T. Campbell

Justice





Publish.