COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                 FORT
WORTH

 

 

                                        NO.
2-08-148-CR

 

 

DANIEL ERIC ROOF                                                              APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

              FROM THE 355TH DISTRICT COURT OF HOOD COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------








A jury convicted Appellant Daniel Eric Roof of
engaging in organized criminal activity and aggravated assault with a deadly
weapon.  The jury assessed punishment at
ninety‑nine years= confinement for engaging in
organized criminal activity and twenty years=
confinement for aggravated assault.  The
trial court then sentenced him accordingly, with the sentences to run concurrently.  In three issues, Appellant argues that (1)
the trial court abused its discretion and violated his rights to due process of
law, compulsory process, and a fair trial under both the state and federal
constitutions by refusing to grant a necessary and proper continuance; (2) the
trial court abused its discretion in failing to grant the requested accomplice
witness instruction for Jennifer Gomez‑Perez; and (3) the cumulative
total of the errors committed by the trial court amounts to reversible error.  Because we hold that the trial court
reversibly erred in denying Appellant=s
requested accomplice witness instruction, we reverse the trial court=s
judgment and remand this cause for a new trial. 


Facts








Appellant was arrested and charged with two
counts of engaging in organized criminal activity, one count of murder, and one
count of aggravated assault with a deadly weapon.  The testimony at trial showed that on May 6,
2006, Aryan Circle members Robert Byrd, Shawn Goodrich, Johnny Freeman, and
Appellant met with fellow Aryan Circle member James Newell and his mother, Ruth
Adkins, at a Diamond Shamrock convenience store.  Atkins complained to them that her daughter,
Jennifer Newell, had begun shooting methamphetamine with James Padgett,
Jennifer=s
boyfriend, and that he was Aspinning
[her] out.@ 
ASpinning
out@ refers
to being high on methamphetamine to the point of unconsciousness.

Byrd, Goodrich, Freeman, and Appellant then drove
to Padgett=s home in Granbury, Texas.  The truck they were driving belonged to one
of Byrd's friends, Jennifer Gomez-Perez, who was riding with them.  Padgett was not at home, but the group
encountered him in his truck as they left his subdivision.  The four men got out of the truck; Appellant
and Byrd were armed with knives.  Both
men=s knives
had black blades and handles, but Appellant=s knife
also had holes in the handle.  Freeman
punched Padgett in the mouth, and both Appellant and Byrd stabbed Padgett.

The men then got back in the truck, and as they
drove away, Appellant used beer to clean off his knife, which he then threw out
of the truck somewhere behind the front gate of the subdivision.  Appellant complained that his knife had been Atoo dull
to do anything,@ but Byrd stated that he Agot
[Padgett] good enough.@

Padgett was taken to the hospital after he was
found by people driving through the area. 
Relying on a tip from Goodrich, a sheriff=s deputy
subsequently found a knife that Goodrich identified as Appellant=s.  Padgett suffered from multiple complications
from his injuries and died about a year after the attack.








Appellant was indicted on four charges and
brought to trial.  The jury was ultimately
charged on two of the offenses for which Appellant had been indicted: engaging
in criminal activity (count three) and aggravated assault with a deadly weapon
(count four).  The jury found him guilty
on both counts.

                         Accomplice
Witness Instruction Required 








Appellant requested a jury instruction regarding
the testimony of Jennifer Gomez‑Perez, asking that the jury be instructed
to determine whether she was an accomplice as a matter of fact; the trial court
denied his request.  In his second issue,
Appellant complains of this denial.  The
code of criminal procedure provides,  AA
conviction cannot be had upon the testimony of an accomplice unless
corroborated by other evidence tending to connect the defendant with the
offense committed; and the corroboration is not sufficient if it merely shows
the commission of the offense.@[2]  A witness may be an accomplice either as a
matter of law or as a matter of fact.[3]  Unless the evidence clearly shows that the
witness is an accomplice as a matter of law, in that the witness has been or
could have been indicted with the same offense, the question of whether the
witness is an accomplice is properly left to the jury as an issue of fact.[4]  The instruction in that case must define the
term Aaccomplice@ and
instruct the jury that, if the jury determines that the witness is an
accomplice as a matter of fact, the jury may not convict on the accomplice
testimony unless the testimony is corroborated by other evidence tending to
connect the defendant with the offense committed, and that the corroboration is
not sufficient if it merely shows the commission of the offense.[5]  








In determining whether a person is an accomplice,
courts may look to events before, during, and after commission of the offense,
including actions that show an understanding and common design to do a certain
act.[6]  To be an accomplice witness, there must be
some affirmative act on the witness=s part
to assist in the commission of the offense.[7]  A witness is not deemed an accomplice because
he knew of the crime but failed to disclose it or even concealed it.[8]  Likewise, mere presence at the scene or
acting as accessory after the fact is not sufficient to make a witness an
accomplice.[9]

The record shows the following.  Gomez‑Perez lived with Robert Byrd. She
owned the Dodge truck used to transport the group to and from the crime
scene.  Gomez-Perez, Appellant, Goodrich,
and Byrd drove to Freeman=s house in Granbury to pick him
up.  They then went to a convenience
store.  Freeman and Byrd got out of the
truck to go talk to James Newell and his mother in the parking lot.  They talked for a few minutes and then got
back into the truck.  The group then
drove to James Padgett=s house.  They discussed killing a person in general as
they drove around.  Although Gomez‑Perez
claimed that Freeman drove, not she, and that she had ridden along only because
she was concerned about the welfare of her truck, she admitted that she had
heard the men talking about going to find James Padgett.  She also admitted that she knew Robert Byrd
and Appellant were members of an Aryan gang and that she had met them through
her involvement with drugs.








When Gomez-Perez, Appellant, and the others
arrived at Padgett=s house, a female was standing
on the porch.  Byrd asked if Padgett was
there, and she said that he was not.  The
driver turned the truck around to leave. 
As they were leaving the subdivision, they saw Padgett coming in.  As they passed Padgett, according to
Gomez-Perez=s testimony, Freeman turned the
truck around and pulled in front of Padgett. 
Gomez‑Perez testified that Appellant, Freeman, and Byrd got out of
the truck and that Appellant and Byrd were carrying knives.  They took the knives with them as they walked
behind Gomez‑Perez=s truck.  Gomez‑Perez made no attempt to drive
her truck away from the scene but instead stayed inside, waiting.  She testified that she was not curious about
what the men were going to do with their knives.








When they came back to the truck, the men were
breathing heavily and were still carrying their knives; their clothes had blood
on them.  As they drove off in the
pickup, Byrd threw the knives out of the truck after A[t]hey
were wiped off.@ 
Gomez-Perez claimed that Freeman was still driving.  They drove down country roads until they
ended up at a Wal‑Mart.  Although
Gomez‑Perez claimed to be afraid of the men, she went into the Wal‑Mart
store with them to buy clothes to replace their bloody clothing, she paid for
their new clothes, and she stayed with them as they drove to Desoto.  She rented a room for all of them, and they
all went into the room.  Byrd and Freeman
took her phone and her keys to her truck and left.  She stayed in the room with Appellant and
Goodrich.

Goodrich, who admitted that he was with the group
on the day they stabbed Padgett, testified that he stayed in the truck with
Gomez‑Perez while the others got out to talk to James Newell and his
mother at the convenience store. 
Goodrich testified that when they pulled over in front of Padgett, he
thought there was just going to be a fight. 
But he also admitted that beforehand, while riding in the pickup, he
heard Byrd talking about killing someone. 
Again, this conversation occurred during the pickup truck ride before
the attack occurred.  Goodrich said that
Byrd was trying to pump up Appellant to see if he had Aever
done that before@ and to see if Appellant would
be able to stab Padgett.  The men got out
of the truck carrying their knives. Goodrich saw the attack begin, and he heard
it finish.  He testified that when Appellant
got back in the truck, Appellant said that his knife was too dull to do anything.  Goodrich testified that, in his opinion,
based on what he saw that day and based on what he knew about the men in the
Aryan Circle gang, the stabbing of James Padgett was done Ain
furtherance of the gang.@








Gomez‑Perez claimed that she was sitting in
the back seat the entire day of the attack. 
But there is also some evidence that she was in the front seat.  Jennifer Newell testified that when Appellant
came by looking for Padgett at the house she shared with Padgett, she saw Gomez‑Perez
seated in the front seat of the pickup beside the driver.

James Lanningham saw the men running from the
scene of the stabbing to Gomez-Perez=s
truck.  Lanningham testified that he saw
the men who had stabbed Padgett notice him, and then they turned around and
fled.  They ran toward Gomez-Perez=s truck,
and he watched them jump into it.  He did
not remember whether the truck doors were open. 
He did not remember seeing anybody get in via the driver=s
door.  They got in through the rear
driver=s side
door and the front and back passenger side doors.  He testified that that fact led him to
believe that someone he had not seen was behind the wheel.

Gomez-Perez testified that Freeman had been
driving before he got out of the truck to attack Padgett, and Jennifer Newell
testified that Gomez-Perez was sitting beside the driver.  If, as Lanningham suggested, neither Freeman
nor any other man got into the driver=s seat
after the assault, that is some evidence that Gomez-Perez was the getaway
driver.  In contrast to Lane v. State,[10]
this is not a case of Amere presence.@

Considering the evidence as a wholeC 

$                  
the truck belonged to Gomez‑Perez, 








$                  
she knew the men were members of the Aryan
Circle, 

$                  
she went with them in her truck to the Diamond
Shamrock,

$                  
she saw them talking to James Newell and his mother (although there is
no evidence that she heard what they discussed),

 

$                  
in the truck, the group discussed killing a person, asking whether
Appellant was up to it and trying to pump him up,

 

$                  
Gomez-Perez accompanied the men to Padgett=s house,
looking for him and asking about his whereabouts,

$                  
they pulled over Padgett=s truck, she waited in her truck while the men
got out with knives and stabbed Padgett, and she may have been the getaway
driver, and

 

$                  
although their clothes were bloody when they got back in the truck,
and they wiped off their knives and threw them out of the truck, she
nevertheless went with them to Wal‑Mart and bought them new clothes, and
then to DeSoto where she rented them a motel room, and then she gave her keys
to Freeman so he and Byrd could drive her truck awayC 

 

we hold that there is some indication that Gomez-Perez acted as an
accomplice by providing the truck and the gasoline, accompanying the attackers,
staying in the truck as a lookout would, keeping the truck at the crime scene
to be available for the attackers to escape, and then acting as the getaway
driver.  This evidence is more than
sufficient to permit the jury to conclude as a matter of fact that Gomez-Perez
was an accomplice.  The trial court,
therefore, erred in refusing to submit an instruction on accomplice as a matter
of fact. 

 








Appellant Suffered Some Harm








Next, under Almanza, we must determine
whether Appellant suffered any harm.[11]  There was no physical evidence connecting
Appellant to the offense.  Although there
is evidence from various witnesses concerning his participation, all of the
witnesses who testified concerning the acts they viewed at or near the time of
the offense were accomplice witnesses, except for Jennifer Newell and
Lanningham.  Lanningham could not
identify Appellant as one of the men he saw running to the truck.  Jennifer Newell testified that she saw
Appellant in the truck, but there was also evidence that she had a very serious
drug problem and fell off the porch when she came outside in response to Gomez‑Perez=s truck=s
approach.  Jennifer Newell=s
testimony conflicted with Gomez-Perez=s
testimony concerning where Gomez-Perez was sitting in the truck.  It is unclear whether the jury found Jennifer
Newell a credible witness.         The only evidence connecting Appellant to
the offense itself was the testimony of the accomplices, including Gomez‑Perez.  Applying the appropriate test, we therefore
hold that Appellant suffered some harm as a result of the trial court=s error
in refusing to instruct the jury to consider whether Gomez‑Perez was an
accomplice as a matter of fact.  We
sustain his second issue.  

Conclusion

Because his second issue is dispositive, we do
not address Appellant=s remaining issues,[12]
except to note, in the interest of judicial economy, that he is entitled to the
previous testimony of the witnesses for purposes of cross- examination.[13]  Having sustained Appellant=s second
issue, we reverse the trial court=s
judgment and remand this cause for a new trial. 

 

 

LEE
ANN DAUPHINOT

JUSTICE

 

PANEL:  DAUPHINOT, GARDNER, and MEIER, JJ.

 

DO NOT PUBLISH

Tex. R. App. P. 47.2(b)

 

DELIVERED:  February 26, 2009











[1]See Tex. R. App. P. 47.4.





[2]Tex. Code Crim. Proc.
Ann. art. 38.14 (Vernon 2005).





[3]Cocke v. State, 201 S.W.3d 744, 747
(Tex. Crim. App. 2006), cert. denied, 549 U.S. 1287 (2007).





[4]Id. at 747B48.





[5]Id. at 747; see also
Tex. Code Crim. Proc. Ann. art. 38.14.





[6]See Kunkle v. State, 771 S.W.2d 435, 439
(Tex. Crim. App. 1986), cert. denied, 492 U.S. 925 (1989).





[7]Kutzner v. State, 994 S.W.2d 180, 187
(Tex. Crim. App. 1999).





[8]Blake v. State, 971 S.W.2d  451, 454 (Tex. Crim. App. 1998); Harris v.
State, 738 S.W.2d 207, 215B16 (Tex. Crim. App. 1986), cert. denied,
484 U.S. 872 (1987); Russell v. State, 598 S.W.2d 238, 249 (Tex. Crim.
App.), cert. denied, 449 U.S. 1003 (1980).





[9]Blake, 971 S.W.2d at 454; Harris,
738 S.W.2d at 215B16.





[10]991 S.W.2d 904, 907 (Tex.
App.CFort Worth 1999, pet. ref=d).





[11]See Herron v. State, 86 S.W.3d 621, 632
(Tex. Crim. App. 2002).





[12]See Tex. R. App. P. 47.1.





[13]See Tex. R. Evid. 615; Enos
v. State, 889 S.W.2d 303, 305 (Tex. Crim. App. 1994) (explaining the Gaskin
rule).