

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-13-00114-CR

_____

BRADLEY WAYNE SHIPLEY, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 115th District Court
Upshur County, Texas
Trial Court No. 16,356

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Justice Carter

# MEMORANDUM OPINION

Bradley Wayne Shipley was convicted by a jury of burglary of a habitation. He pled true to the State's enhancement paragraph and was sentenced to thirteen years' imprisonment and ordered to pay a $10,000.00 fine. On appeal, Shipley argues (1) that the evidence is insufficient to support his conviction, (2) that the testimony of an accomplice witness was not sufficiently corroborated, (3) that the State's notice of enhancement filed after jury selection was untimely, and (4) that the trial court erred in (a) failing to instruct the jury on the accomplice-witness rule, (b) disallowing cross-examination of the accomplice, (c) allowing the State to impeach Shipley about his jailhouse tattoos, and (d) admitting evidence of unadjudicated offenses allegedly committed by Shipley while he was a juvenile.

We conclude that the evidence was sufficient to support Shipley's conviction and that the accomplice-witness testimony offered at his trial was sufficiently corroborated. As a result, the trial court's failure to give the accomplice-witness instruction did not egregiously harm Shipley. The record demonstrates that the trial court allowed the cross-examination of the accomplice and that the complaint about Shipley's jailhouse tattoos was unpreserved. We find that the State's notice of enhancement was timely filed and that Shipley's complaint regarding unadjudicated juvenile offenses was not preserved. Consequently, we affirm the trial court's judgment.

## I.     Shipley's Conviction is Supported by Legally Sufficient Evidence

### A.     Standard of Review

In evaluating legal sufficiency, we review all the evidence in the light most favorable to the jury's verdict to determine whether any rational jury could have found the essential elements

2

of burglary of a habitation beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd) (citing *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007)). We examine legal sufficiency under the direction of the *Brooks* opinion while giving deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19).

Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically correct jury charge "sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id*.

Paragraph one of the State's indictment alleged, and the State was required to prove, that Shipley intentionally or knowingly entered Jose Antonio Olmos' home without his effective consent and with the intent to commit theft. *See* TEX. PENAL CODE ANN. § 30.02 (West 2011), § 31.03(a) (West Supp. 2013); *Stine v. State*, 300 S.W.3d 52, 56 (Tex. App.—Texarkana 2009, pet. dism'd, untimely filed).

3

**B.** **The Evidence**

Immediately upon entering the front door of their Pittsburg, Texas, home on a November morning, Olmos and his wife, Mary Ann Munoz, discovered that the home had been ransacked. They heard a noise from the back door and rushed to investigate the sound. Olmos saw two men jumping over their backyard fence carrying goods stolen from their home. Olmos gave chase on foot, and Munoz jumped into the family truck in an attempt to apprehend the thieves by blocking their path. Munoz managed to stop one thief, whom she identified at trial as her nephew, Angel Ramirez.

Ramirez' mother, also Munoz' sister, had previously been married to Olmos. Ramirez, who lived with Shipley in Gilmer, Texas, at the time of the burglary, had grown up in Olmos' Pittsburg home and knew it well. Olmos had taken care of Ramirez and had provided for Ramirez while he lived with him. After apprehending Ramirez, Munoz began cursing at him for his ingratitude and disrespect toward Olmos. Munoz' nephew-in-law, Kerry Eugene Tarter, surrendered himself to Munoz as an accomplice so that Ramirez would not have to shoulder all the blame for the crime.

As Munoz was dealing with Ramirez and Tarter, Olmos arrived on the scene. Olmos knew someone must have transported Ramirez and Tarter from Gilmer to Pittsburg, so he jumped into the truck Munoz had been driving and began to search for another accomplice. Olmos chased a suspicious black truck that he did not recognize, but he was unable to catch up to the truck and returned home.

4

Meanwhile, Munoz walked with Ramirez and Tarter back to her driveway. When they arrived, she discovered a pair of abandoned blue gloves that were similar to the gloves Ramirez and Tarter were wearing. Munoz was questioning Ramirez and Tarter at the end of her driveway when a man driving a black Dodge truck almost ran her over. Munoz testified at trial that she could clearly see the driver, whom she identified as Shipley. According to both Munoz and Olmos, Ramirez and Tarter identified Shipley as the driver of the black Dodge truck and as an accomplice in the burglary. Tarter's fiancée, Valentina Marie Lugo, testified that she received a call from Shipley after the incident informing her that Ramirez and Tarter had been captured.

Ramirez and Tarter were arrested by Officer David Thompson. David Cruce, an investigating officer, conducted subsequent interviews at which time Ramirez and Tarter admitted to the burglary. Thompson and Cruce also testified that Ramirez and Tarter implicated Shipley in the burglary. According to Cruce, Tarter also admitted to stealing gloves from Walmart on the morning of the burglary. Charles Wayne Blankenship, an assistant manager in loss prevention at Walmart, pulled security footage from the day of the burglary. The footage, which was played for the jury, showed that Tarter and Ramirez exited a parked black Dodge truck and entered the store while the driver waited. Cruce ran the truck's license plate, and discovered that it was registered to Shipley's father.

After reviewing the Walmart footage, Cruce went to Shipley's home and knocked on the door. Cruce testified that Shipley appeared nervous and lied by saying that he had been home the entire day. Shipley was eventually arrested.

5

At Shipley's trial, Tarter testified that he, Ramirez, Shipley, and all of their significant others had gathered at Shipley's home on the night before the burglary. According to Tarter, Ramirez came up with the idea to rob Munoz and Olmos. Tarter further testified that he, Ramirez, and Shipley developed a plan for the burglary at the gathering the night before.

Pursuant to the plan, Tarter walked to Shipley's home where Ramirez was staying. The trio climbed into Shipley's truck and drove to Walmart where Ramirez and Tarter stole three pairs of blue latex gloves. Tarter testified that Shipley parked across the street from the Olmos/Munoz home in a way that would hide them from view while they waited for Olmos and Munoz to leave. Munoz and Olmos' neighbor, Harlan Taylor, testified that he saw Shipley's truck parked near a cemetery close to his house and that the truck would have been hidden from Munoz' and Olmos' views.

When Olmos and Munoz left their home, Tarter, Ramirez, and Shipley ran to their backyard. Tarter testified that Shipley broke a window on the rear of the home with a pipe wrench, allowing entry into the home. When Olmos and Munoz returned home, Tarter testified that he and Ramirez ran in the same direction and that Shipley ran in the opposite direction, permitting his escape. Munoz testified that while she recovered some items taken from her home, other items were still missing.

Alissa Scott, Shipley's cousin, was at Shipley's house with Ramirez, Tarter, and their significant others on the night before the burglary. Scott testified that she overheard Ramirez and Tarter asking Shipley to give them a ride to Olmos' house. Scott testified that she did not know about the burglary and that she believed Ramirez and Tarter were going to be working

6

around Olmos' house in exchange for payment. According to Scott, Shipley said that he lied to the police about being home all day.

Shipley testified at his own trial. He denied involvement in the burglary and claimed he was dropping off Ramirez and Tarter so that they could work at Olmos' house. Shipley testified that he went to his dad's house immediately after dropping them off, but returned to see what time they needed to be picked up. According to Shipley, on his way back to Olmos' house, he saw Ramirez and Tarter being chased, concluded they had done something illegal, which he wanted no part of, and returned home. Shipley claimed he did not stop to assist Ramirez and Tarter because of his criminal record. He testified that he lied to police about the incident because he was on community supervision.

### C.     Analysis

The evidence meets the State's burden to prove that Shipley committed burglary of a habitation. Olmos, Munoz, Cruce, Thompson, Tarter, and others all testified that Shipley was involved in the burglary. Shipley admitted that he drove to Walmart and dropped Ramirez and Tarter off at Olmos' house. Tarter testified that Shipley used a pipe wrench to break the window through which the burglars entered the home and that Shipley ran in the opposite direction from Ramirez and him when they were discovered by Olmos.[1] Ramirez and Tarter were wearing blue latex gloves when they were apprehended. An additional pair of blue latex gloves was found discarded in the driveway. The jury was free to determine that this pair of gloves belonged to Shipley. Munoz testified that Shipley attempted to run her over in his vehicle, an act inconsistent

---

[1]Olmos testified that the entry was without his consent.

7

with Shipley's assertions to the jury that he fled and did not want to be involved in any wrongdoing. Shipley admitted to lying to investigators about the incident.

It was the jury's responsibility "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper*, 214 S.W.3d at 13. Viewing the evidence in a light most favorable to the verdict, we find the evidence legally sufficient to establish that Shipley intentionally or knowingly entered Olmos' home without his effective consent and with the intent to commit theft. We overrule Shipley's first point of error.

## II. The Accomplice's Testimony Was Sufficiently Corroborated

"A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2005). Shipley argues that Tarter's accomplice-witness testimony was not sufficiently corroborated.

Legal sufficiency standards of review are not applicable to a review of accomplice-witness testimony under Article 38.14 of the Texas Code of Criminal Procedure because corroboration of such testimony is a statutory requirement imposed by the Texas Legislature. *See id.*; *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008) (citing *Druery v. State*, 225 S.W.3d 491, 498 (Tex. Crim. App. 2007)). Thus, a challenge of insufficient corroboration is not the same as a challenge of insufficient evidence to support the verdict as a whole. *Cathey v. State*, 992 S.W.2d 460, 462–63 (Tex. Crim. App. 1999).

8

When evaluating the sufficiency of corroborating evidence under Article 38.41, we "'eliminate the accomplice testimony from consideration and then examine the remaining portions of the record to see if there is any evidence that tends to connect the accused with the commission of the crime.'" *Malone*, 253 S.W.3d at 257 (quoting *Solomon v. State*, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001)). The tends-to-connect standard does not present a high threshold as the "evidence need not prove the defendant's guilt beyond a reasonable doubt by itself." *Id.*; *see Cantelon v. State*, 85 S.W.3d 457, 461 (Tex. App.—Austin 2002, no pet.). "Rather, the evidence must simply link the accused in some way to the commission of the crime . . . ." *Malone*, 253 S.W.3d at 257. As the Texas Court of Criminal Appeals has stated,

> No precise rule can be formulated as to the amount of evidence required to corroborate. The non-accomplice evidence does not need to be in itself sufficient to establish guilt beyond a reasonable doubt. Nor must the non-accomplice evidence directly link the accused to the commission of the offense. While the accused's mere presence in the company of the accomplice before, during, and after the commission of the offense is insufficient by itself to corroborate accomplice testimony, evidence of such presence, coupled with other suspicious circumstances, may tend to connect the accused to the offense. Even apparently insignificant incriminating circumstances may sometimes afford satisfactory evidence of corroboration.

*Dowthitt v. State*, 931 S.W.2d 244, 249 (Tex. Crim. App. 1996) (citations omitted).

Eliminating Tarter's testimony does little to break Shipley's connection with the burglary. Shipley was seen on a surveillance video recording driving Ramirez and Tarter to the Walmart parking lot. Cruce's investigation revealed that three pairs of gloves were taken from Walmart. Shipley admitted to driving Ramirez and Tarter to Olmos' house. Ramirez and Tarter were apprehended while wearing their gloves. Another pair of gloves was found in Olmos'

9

driveway. While in the driveway, Munoz was almost run over by Shipley's truck. Munoz identified Shipley at trial as the driver of the truck. Munoz, Olmos, Cruce, and Thompson all testified that Ramirez and Tarter identified Shipley as a participant in the burglary. Lugo testified that Shipley called her after the burglary to inform her that "they had got caught," implying at the very least that Shipley had knowledge of some wrongdoing conducted by Ramirez and Tarter. When questioned, Shipley initially lied to the police.

We conclude that the nonaccomplice testimony tends to connect Shipley with the burglary, and, consequently, we overrule Shipley's second point of error.

## III.    Lack of an Accomplice-Witness Instruction Was Not Egregiously Harmful

Shipley argues that he was entitled to an accomplice-witness jury instruction and that the trial court erred in failing to submit such an instruction. Our review of alleged jury charge error involves a two-step process. *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994); *see Sakil v. State*, 287 S.W.3d 23, 25–26 (Tex. Crim. App. 2009); *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). Initially, we determine whether an error occurred and then "determine whether sufficient harm resulted from the charging error to require reversal . . . ." *Abdnor*, 871 S.W.2d at 731–32*; Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g); *see also Middleton v. State*, 125 S.W.3d 450, 453 (Tex. Crim. App. 2003).

The trial court shall "deliver to the jury . . . a written charge distinctly setting forth the law applicable to the case . . . ." TEX. CODE CRIM. PROC. ANN. art. 36.14 (West 2007). It is

10

undisputed that Tarter was an accomplice in the burglary.[2]  Shipley was entitled to an accomplice-witness instruction indicating that a conviction is not valid without corroboration of an accomplice's testimony.  *See* TEX. CODE CRIM. PROC. ANN. art. 38.14.  A trial court must instruct the jury sua sponte in accordance with Article 38.14 where applicable.  *Freeman v. State*, 352 S.W.3d 77, 82–83 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd) (holding trial judge erred in failing to instruct jury sua sponte that testimony of accomplice was required to be corroborated in accordance with Article 38.14).  Thus, the trial court erred in omitting the Article 38.14 instruction.

Next, we discuss whether the failure to include the accomplice-witness instruction harmed Shipley.  The level of harm an appellant must demonstrate as having resulted from the erroneous jury instruction depends on whether the appellant properly objected to the error.  *Abdnor*, 871 S.W.2d at 732.  "Where the evidence clearly shows a witness is an accomplice as a matter of law, the trial court must so instruct the jury, but if the appellant fails to object to the omission of the instruction, as in [Shipley's] case, he or she must prove egregious harm to prevail on appeal."  *Hall v. State*, 161 S.W.3d 142, 149 (Tex. App.—Texarkana 2005, pet. ref'd); *see Ngo*, 175 S.W.3d at 743–44 (citing *Almanza*, 686 S.W.2d at 171); *see also Bluitt v. State*, 137 S.W.3d 51, 53 (Tex. Crim. App. 2004).  In determining whether egregious harm has been shown, we "must take the entire record into account, as in any *Almanza* analysis."  *Casanova v. State*, 383 S.W.3d 530, 534 (Tex. Crim. App. 2012).

---

[2]A person who has been indicted for the same or a lesser-included offense is an accomplice as a matter of law. *Smith v. State*, 332 S.W.3d 425, 439 (Tex. Crim. App. 2011).

"Under the 'egregious harm standard,' the omission of a corroborating-evidence instruction may be rendered harmless if [evidence] other . . . than the testimony of the accomplice witness or informant does exist that fulfills the purpose of the instruction." *Simmons v. State*, 205 S.W.3d 65, 77 (Tex. App.—Fort Worth 2006, no pet.) (citing *Herron v. State*, 86 S.W.3d 621, 632 (Tex. Crim. App. 2002)). "This is said to be so because the instruction merely informs the jury that it cannot use the testimony of the accomplice or the informant unless it is first determined that other evidence exists connecting the defendant to the offense." *Id*. Once it is determined that such other evidence exists, the purpose of the instruction may have been fulfilled, but this is not always true. *Id.* If the corroborating nonaccomplice evidence is "'so unconvincing in fact as to render the State's overall case for conviction clearly and significantly less persuasive,'" the omission of the instruction can be egregiously harmful. *Hall*, 161 S.W.3d at 150 (quoting *Herron*, 86 S.W.3d at 632).

"A harm analysis for error in omitting the cautionary instruction on the requirement of corroborating evidence must be 'flexible,' taking into consideration both the existence and the strength of such other evidence." *Simmons*, 205 S.W.3d at 77 (citing *Herron*, 86 S.W.3d at 632). "In determining the strength of corroborating evidence, we are instructed that we must examine (1) its reliability or believability and (2) the strength of its tendency to connect the defendant to the offense." *Id*. (citing *Herron*, 86 S.W.3d at 632).

Here, we have previously determined that Tarter's testimony was sufficiently corroborated by testimony from Munoz, Olmos, Cruce, Thompson, and Lugo. Shipley's involvement in the burglary was additionally supported by physical evidence, including the

12

Walmart surveillance footage, the third pair of gloves found on the driveway, and the broken window on the back side of the home. Taking the entire record into account, we conclude that Shipley was not egregiously harmed by the trial court's omission of the accomplice-witness instruction.

We overrule Shipley's third point of error.

## IV.    The Trial Court Did Not Prevent Cross-Examination of Tarter

During cross-examination, Tarter testified that, after speaking with his attorney, he understood (1) that he had the right to remain silent, (2) that he did not have to testify, (3) the importance of testifying truthfully, and (4) the ramifications of testifying falsely. When Tarter was asked whether he would be offered a negotiated plea agreement in exchange for testimony, the State lodged the following objection:

> [By the State]:  Your Honor, I'm going to object.  It's been asked and answered already under direct testimony.  Not only has this witness said he's been promised nothing, and he has not, and I as an officer of the court I'm going to put that on the record.  I've made no promises with him.  Second, he's already testified that everything he testified today to this jury he gave a video statement of these same facts that the defendant has from November 16th of this last year.  So this has been asked and answered.

The trial court overruled the objection, stating that the line of questioning was allowed during cross-examination.[3]

---

[3]"There exists a long line of federal and state authority holding a pending criminal charge is an appropriate area of cross-examination." *Carroll v. State*, 916 S.W.2d 494, 499 (Tex. Crim. App. 1996).

The cross-examination continued as follows:

Q.      [By defense counsel] Mr. Tarter, you understand that your testimony today is going to be considered as far as what type of plea offer you're going to get in front of the district attorney's office, you understand that.

A.      Yes, I understand that's going to be looked at, but I don't know what's going to happen after today.

Q.      Now you were told that there was no promise as far as what the plea offer is going to be; is that correct?

A.      It's -- exactly.

Q.      Okay.  But you were told if you didn't testify truthfully that, you know, you may not have a good plea offer.

[By The State]:  Your Honor, I'm going to --

A.      The only way --

[By The State]:  -- object because that's calling for a hearsay statement of what he's been told outside the courtroom.  That's hearsay. And number two, Counsel needs to be careful not to pierce the attorney/client privilege that this defendant still has with his own client.

THE COURT:  I'm going to sustain the first part of your objection.

Shipley argues that the trial court's second ruling "appear[ed] to shut off further cross examination" into any potential bias Tarter might have had.

However, the trial court's ruling sustained only a hearsay objection, and there is no argument by Shipley that the hearsay objection was improperly sustained.[4]  Instead of limiting cross-examination regarding potential bias, the trial court encouraged it by reminding the parties

---

[4]Hearsay is an out-of-court statement "offered in evidence to prove the truth of the matter asserted" and is generally not admissible unless allowed "by other rules prescribed pursuant to statutory authority."  TEX. R. EVID. 801(d), 802.

that the line of questioning was appropriate for cross-examination and by dismissing the State's warning of potential waiver of attorney/client privilege. Shipley's fourth point of error is without merit and is overruled.

**V.      Shipley Failed to Preserve Any Error Stemming from Cross-Examination Concerning his Tattoos**

During Shipley's direct examination, he testified that he pled guilty to indecency with a child when he was fourteen years old because he was young, scared, and did not have money for an attorney. Thereafter, Shipley had been prosecuted for failure to register as a sex offender because he had falsified his address on three separate occasions. Yet, Shipley explained the falsifications to the jury by stating that he did not want to impact his current wife's custody battle with her ex-husband by letting the ex-husband discover that she was living with Shipley.

During cross-examination, Shipley testified that he was not involved in the burglary and that he fled the scene and lied to police because of his criminal history. The State, in an effort to rebut the impression of Shipley's favorable character, pursued the following line of questioning:

> Q.      [By the State] Those tattoos you have covered up on your arms, you have quite a few of them, don't you?
>
> A.      Yes, sir, I do.
>
> Q.      Those tattoos, did you receive those in prison?
>
> A.      Some -- most of them, yes, sir.
>
> Q.      Okay. And those tattoos have meaning, don't they?
>
> A.      Some of them.

Q.      Okay.  In fact you like to sign your text messages or excuse me you like to sign statements in the past with certain gang affiliations, don't you?

[By Defense Counsel]:  Your Honor, I'm going to object for relevance.

[By the State]:  Goes to his credibility, Your Honor.

THE COURT:  Overruled.

Q.      . . . You have certain gang affiliations that you've acquainted yourself in the penitentiary, correct?

A.      No, sir, I'm not affiliated with any gang, sir.

. . . .

Q.      Which ones of those did you get in prison?

A.      All of them except for one up here.

. . . .

Q.      Iron cross and swastika, I know what that means and you know what that means, don't you?

A.      Yes, sir, I know exactly what it means.

Q.      Okay.  And it means what, tell the jury.

A.      To me it means I don't believe in any racial relationships, not necessarily most people look at white supremacy or white pride.  I mean, that's not how I look at it.  That's not -- that's not its meaning to me, you know what I'm saying.

Q.      Mr. Shipley, it's Aryan Brotherhood, isn't it?

A.      No, sir, it --

Q.      And that is their gang sign that they have in the penitentiary and they are a prison gang, Aryan Brotherhood.  And you while in prison associated

16

and affiliated yourself with that prison gang and that's why you have the tattoo. You're wearing the colors, isn't it?

> A.     No, a swastika goes for almost every Aryan gang and even white people that's not in the gang. I mean, it goes for almost every single one that they have out there. It's not just a swastika and iron cross. That has nothing to do with -- doesn't always mean it has anything to do with a gang. It's not got a patch around it. It's not got a diamond around it or a square around it. The square and the diamond is for AB and AC. This is plain.

Shipley complains that the trial court erred in allowing the State to question him about his tattoos.[5] However, Shipley's only relevance objection during this entire line of questioning was a relevance objection related to the State's suggestion of gang affiliation.[6] He did not object to the State's questions about his tattoos. The trial objection must comport with the issue raised on appeal. *See Swain v. State*, 181 S.W.3d 359, 367 (Tex. Crim. App. 2005).

Furthermore, the State continued to ask questions about Shipley's tattoos, without objection, and Shipley continued to answer those questions at length. When a party receives an adverse ruling, he must preserve error by objecting each time the evidence in question is offered or obtain a running objection. *Valle v. State*, 109 S.W.3d 500, 509 (Tex. Crim. App. 2003);

---

[5]"As a prerequisite to presenting a complaint for appellate review, the record must show that: (1) the complaint was made to the trial court by a timely request, objection, or motion . . . ." TEX. R. APP. P. 33.1(a)(1).

[6]"'The general rule is that if a defendant exercises his right to testify he is subject to the same rules governing examination and cross-examination as any other witness, whether he testifies at the guilt-innocence stage or at the punishment stage of the trial.'" *Felder v. State*, 848 S.W.2d 85, 99 (Tex. Crim. App. 1992) (quoting *Cantu v. State*, 738 S.W.2d 249, 255 (Tex. Crim. App. 1987)). "In Texas, the scope of cross-examination is wide open. Once an appellant decides to testify at trial he opens himself up to questioning by the prosecutor on any subject matter which is relevant." *Id.* Relevant evidence is any evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. TEX. R. EVID. 401. Credibility of a witness is relevant and is proper fodder for cross-examination. TEX. R. EVID. 611(b). In certain circumstances, evidence of gang membership can bear on the witness' veracity. *McKnight v. State*, 874 S.W.2d 745, 746 (Tex. App.—Fort Worth 1994, no pet.) (citing *United States v. Abel*, 469 U.S. 45, 49 (1984)); *but see Barlow v. State*, 175 S.W.3d 839, 842–43 (Tex. App.—Texarkana 2005, pet. ref'd).

17

*Ethington v. State*, 819 S.W.2d 854, 859 (Tex. Crim. App. 1991); *Martin v. State*, 151 S.W.3d 236, 240 (Tex. App.—Texarkana 2004, pet. ref'd). While Shipley failed to obtain an adverse ruling in the first place, even if he had, he would have waived the objection by failing to either interpose it each time the evidence in question was offered or seek a running objection.

Shipley failed to object to the relevance of his jailhouse tattoos, as opposed to an alleged gang affiliation. He also failed to object to the State's continued questioning about his tattoos. Consequently, Shipley's testimony concerning his tattoos was admitted into evidence without objection. We find that Shipley failed to preserve his fifth point of error for review and, as a result, overrule it.

## VI. The State Gave Timely Notice of Enhancement

The right to notice of the State's intention to use prior convictions as enhancements is rooted in due process. *Villescas v. State*, 189 S.W.3d 290, 293 (Tex. Crim. App. 2006). Thus, prior convictions used as enhancements must be pled in some form so the defendant has an opportunity to prepare a defense to them. *Pelache v. State*, 324 S.W.3d 568, 577 (Tex. Crim. App. 2010); *Brooks v. State*, 957 S.W.2d 30, 34 (Tex. Crim. App. 1997).

Two days before commencement of the guilt/innocence phase of trial, the State filed a notice of its intent to enhance Shipley's range of punishment based on an October 2007 final felony conviction of failure to comply with sex-offender registration requirements. The notice contained the cause number of the 2007 conviction, stated that the judgment was issued by the 188th Judicial District Court of Gregg County, and stated that Shipley had received a sentence of four years' imprisonment for the offense. Shipley argues that the timing of the State's notice of

18

intent to enhance, which was filed after jury selection, constituted a violation of his due process rights.

The notice was filed two days before the commencement of the guilt/innocence phase. Shipley did not claim that he was surprised by the enhancement and did not request a continuance to better prepare his defense. In fact, Shipley testified during the guilt/innocence phase that he was convicted of failure to register as a sex offender in Gregg County in 2007 and that he served a four-year term of imprisonment because he falsely provided his grandmother's address instead of his then-current address.

"[T]he determination of whether proper notice of enhancements was given does not require that notice be given within a particular period of time before trial or before the guilt phase is completed." *Pelache*, 324 S.W.3d at 577. "[W]hen a defendant has no defense to the enhancement allegation and has not suggested the need for a continuance in order to prepare one, notice given at the beginning of the punishment phase satisfies" due process requirements. *Villescas*, 189 S.W.3d at 294–95; *Pelache*, 324 S.W.3d at 577. Shipley's testimony during guilt/innocence established that he had no defense to the enhancement allegation, and he did not ask for a continuance to prepare any defense. Therefore, due process was satisfied when the State provided notice of intent to enhance after jury selection.

We overrule Shipley's sixth point of error.

**VII.    Shipley Preserved No Error Regarding the Admission of his Juvenile Records**

The Texas Family Code establishes a procedure through which prosecuting attorneys can obtain a criminal defendant's juvenile adjudication records. TEX. FAM. CODE ANN. § 58.007(g) (West Supp. 2013).

The State followed the necessary procedure and obtained Shipley's records of his juvenile adjudication. When the State sought to admit the juvenile records, Shipley objected that the exhibit was inadmissible despite a prior stipulation to its admissibility. On appeal, Shipley concedes that records of a criminal defendant's juvenile adjudications are admissible during the punishment phase of trial. Yet, for the first time on appeal, Shipley argues, without citation to authority, that the records offered by the State in this case contained evidence of unadjudicated offenses.[7]

At trial, Shipley objected to the exhibit as inadmissible because "he was informed the records were sealed." The argument that the document contained some objectionable information was neither one that the trial court considered, nor was it apparent from the context

---

[7]Shipley's juvenile records included, among other items, (1) the petition setting forth six counts of aggravated sexual assault and six counts of indecency with a child, which allegedly occurred over a three-year period, (2) the grand jury's finding of probable cause that Shipley engaged in the acts alleged in the petition, (3) a Children's Assessment Center interviewer's report containing the victim's detailed statements about the alleged acts, (4) Shipley's stipulation of evidence and judicial confession to two counts of indecency with a child, (5) the judgment adjudicating Shipley guilty of a single count of indecency with a child, (6) a detention order finding that Shipley was likely to abscond, and (7) a directive to apprehend Shipley.

of the discussion. Shipley's point of error on appeal does not comport with the objection he raised at trial.[8] *See Swain*, 181 S.W.3d at 367.

Moreover, "[t]he trial court is not required to sort through challenged evidence to segregate the admissible from the inadmissible." *Ross v. State*, 154 S.W.3d 804, 813 (Tex. App.—Houston [1st Dist.] 2004, pet. ref'd) (citing *Willover v. State*, 70 S.W.3d 841, 847 (Tex. Crim. App. 2002); *see Sonnier v. State*, 913 S.W.2d 511, 518 (Tex. Crim. App. 1995)). Shipley concedes that portions of the forty-five-page exhibit were admissible. Because Shipley failed to refer the trial court to the portions of the exhibit which he deemed inadmissible, he failed to preserve his complaint for appellate review. *See id.*; *Whitaker v. State*, 286 S.W.3d 355, 369 (Tex. Crim. App. 2009).

We overrule Shipley's last point of error.

**VIII.  Conclusion**

We affirm the trial court's judgment.


Jack Carter
Justice


Date Submitted:        February 19, 2014
Date Decided:          March 14, 2014

Do Not Publish

---

[8]The State argues that it could offer evidence of Shipley's background and character as well as any extraneous crime or bad act admissible under Article 37.07 of the Texas Code of Criminal Procedure.