Jarrell FREEMAN, Appellant,

v.

The STATE of Texas, Appellee.

No. 14–09–00399–CR.

Court of Appeals of Texas,
Houston (14th Dist.).

Aug. 18, 2011.

Rehearing and Rehearing En Banc
Overruled Nov. 28, 2011.

---

Joseph Salhab, Houston, for appellant.

Donald W. Rogers, Jr., Houston, for state.

Panel consists of Justices BROWN, CHRISTOPHER, and JAMISON.

## OPINION

TRACY CHRISTOPHER, Justice.

Appellant Jarrell Freeman argues that his conviction for aggravated robbery must be reversed because he was egregiously harmed by the trial court's failure to instruct the jury sua sponte that it could not convict appellant based solely on the testi-

mony of accomplices. Because we agree that rational jurors would have found the State's case significantly less persuasive if they had been properly instructed, we agree. We accordingly reverse and remand the case for a new trial.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Between 10:30 and 11:00 p.m. on November 29, 2007, Rebecca Arredondo noticed that a gold or brown four-door car had backed into the driveway of her duplex on Fresa in Pasadena. As she watched, three male passengers exited the vehicle. Arredondo could not describe the men, but she thought that they wore long pants and long-sleeved shirts. The man nearest to her wore a blue or black bandana over his face and hid something under his arm. When the men began walking toward the convenience store on the corner of Fresa and Lafferty, Arredondo feared that they were going to rob it, and she immediately telephoned 911. Arredondo was still on the phone several minutes later when she heard and saw the car slowly pull out of the driveway. She reported this to the 911 dispatcher.

Officer Joseph Gonzales of the Pasadena Police Department was driving on Fresa when he heard the call about a suspicious four-door, gold-colored vehicle. As he approached the convenience store, he saw three people crouched outside. He pulled into the parking lot as the three people ran toward the front of the store. Believing there was a possible robbery in progress, he called for assistance.

Store owner Abdul Seth and employee Eugene Manger were working at the convenience store that night when three black men with dark cloths over their faces entered. Seth could state only that the cloths were a dark color, but Manger stated that they were blue. Both Seth and Manger testified that one man wore jeans and a black long-sleeved t-shirt and another man wore a red long-sleeved t-shirt. Seth did not know what the third man wore, but Manger testified that he wore black clothing as well. Seth testified that he believed from the robbers' voices that they were black. The police did not ask Seth for physical descriptions of the men, but at trial he estimated that the perpetrators were 5'6" or 5'7", and one of them looked heavy. While one of the men held the door and yelled at the others to hurry, another man pointed a gun at Manger and ordered him to lie on the ground. The third man pointed a gun at Seth and ordered him to open the cash register. The man stole cash from the register and grabbed cigars and cigarettes from behind the counter. All three men then ran out of the store, past Gonzales's patrol car, and down Fresa. According to Gonzales, one of the men was wearing dark pants and a dark long-sleeved shirt, and another was wearing dark pants and a dark hoodie. The third man wore long pants and a red shirt. All three suspects had their faces covered. Gonzales pursued them in his patrol car until the three people entered a wooded area. Shortly thereafter, he joined other officers who had detained Alegra Coleman, the driver of the gold, four-door vehicle. Coleman lived in the apartment complex on the other side of the wooded area where the three suspects who fled on foot disappeared from view.

Meanwhile, police continued their efforts to track the remaining suspects. The wooded area was muddy, and tracking dogs were unable to trace the suspects, but officers found and collected evidence that marked the suspects' path. They found a piece of black cloth and a baseball cap in the parking lot of the convenience store. A trail of cigars and cigarettes was found along the suspects' route down Fresa to the wooded area. Someone had cut

the bottom of the fence that separated the wooded area from the apartment complex where Coleman lived, and there were signs that someone had slid through the mud below the cut in the fence. Near the fence, officers found a second piece of black cloth "tied in the shape of a bandana."

A little after 2:00 a.m., patrol officers went to Coleman's apartment. Through a window, they saw three black males in the living room. Appellant was sleeping on the couch, while another man slept in a recliner and the third man lay on the floor. The men with appellant were later identified as appellant's brother Jonathan Freeman and Coleman's live-in boyfriend Nickalus Roberts. Police knocked and announced themselves, and appellant answered the door. He was wearing a white shirt and dark blue pants or shorts. When he opened the door, police saw a pair of shoes with fresh mud on them near the dining-room table, and a black hoodie was on the floor nearby. Police handcuffed all three men and allowed them to sit on the couch while awaiting detectives.

After the three suspects were arrested and transported from the apartment, police sought and obtained Coleman's consent to search the apartment. They transported her back to her apartment, and she remained in the living room during the search. In the apartment, officers found overalls and two pairs of pants with fresh mud on them. Behind a panel used to access plumbing, police also found some damp, dirty shirts with grass on them and a 38–caliber gun with mud embedded in the backstrap. On the couch in the living room, police found "some pieces of cloth, possibly of a shirt." Jonathan Freeman's wallet containing fifty dollars was on the

back of the couch. In a closet, police found a $100 bill and a bill of sale for Roberts's purchase of a car a year earlier.

Coleman, Roberts, and the Freeman brothers were indicted for aggravated robbery, and Coleman and Roberts pleaded guilty.[1] At appellant's trial, Coleman and Roberts testified that they and the Freeman brothers participated in the robbery; Roberts additionally explained that the masks were made from a black t-shirt. Appellant did not ask the trial court to instruct the jury on the law concerning accomplice-witness testimony, and did not object to the trial court's failure to give such instructions sua Sponte. The jury found appellant guilty as charged, and after considering enhancements, the trial court sentenced appellant to twenty years' confinement in the Texas Department of Criminal Justice—Institutional Division.

In the sole issue presented for review, appellant asks us to reverse his conviction because the trial court failed to inform the jury that a criminal defendant cannot be convicted under Texas law based on the uncorroborated testimony of an accomplice.

## II. ANALYSIS

### A. The trial court erred in failing to instruct the jury on the accomplice-witness rule.

 The trial court is required to instruct the jury on the law applicable to the case. TEX.CODE CRIM. PROC. ANN. art. 36.14 (West 2007). And, by statute, a person cannot be convicted of an offense based solely on the testimony of an accomplice. *Id.* art. 38.14. An accomplice is any person who, with the requisite culpable mental state, participated with the ac-

---

1. Appellant's brother was convicted by a jury. *See Freeman v. State*, No. 14–09–00882–CR, 2011 WL 664762 (Tex.App.-Houston [14th Dist.] Feb. 24, 2011, pet. ref'd) (mem. op., not designated for publication).

cused before, during, or after the crime by performing some affirmative act that promoted its commission. *Druery v. State,* 225 S.W.3d 491, 498 (Tex.Crim.App.2007). Because an accomplice is, by definition, involved in the very crime being prosecuted, the Texas legislature recognized that accomplices seeking to reduce or eliminate their own punishment may attempt to shift blame or curry favor from prosecutors by testifying, even falsely, against others. *Nolley v. State,* 5 S.W.3d 850, 852–53 (Tex.App.-Houston [14th Dist.] 1999, no pet.). The legislature therefore provided that, for the conviction to stand, accomplice testimony must be corroborated by non-accomplice evidence that tends to connect the defendant to the offense. TEX.CODE CRIM. PROC. ANN. art. 36.14.

A person who has been indicted for the same or a lesser-included offense is an accomplice as a matter of law. *Smith v. State,* 332 S.W.3d 425, 439 (Tex.Crim.App. 2011). Because Coleman and Roberts were indicted for aggravated robbery as a result of their involvement in the same offense for which appellant was tried, they are his accomplices as a matter of law. *See id.* The trial court therefore was required to inform the jury of the accomplice-witness rule, and its failure to do so was error. *See Herron v. State,* 86 S.W.3d 621, 631 (Tex.Crim.App.2002).

Citing *Bennett v. State,* the State argues that by failing to request an instruction on the accomplice-witness rule, appellant waived any complaint about its omission. *See Bennett v. State,* 235 S.W.3d 241, 243 (Tex.Crim.App.2007) (holding that trial court did not err in failing to submit unrequested instructions on defense of a third person and defense of property). We disagree. As the Court of Criminal Appeals has explained, defendants have no right to unrequested instructions on "defensive issues," which de-

pend "on the defendant's theory of the case and the evidence presented." *Huizar v. State,* 12 S.W.3d 479, 484 n. 7 (Tex.Crim. App.2000) (op. on reh'g) (citing *Posey v. State,* 966 S.W.2d 57, 62 (Tex.Crim.App. 1998)). But an instruction on the accomplice-witness rule does not depend on the defendant's theory of the case. *Oursbourn v. State,* 259 S.W.3d 159, 180 (Tex. Crim.App.2008). It is implicitly required by statute any time an accomplice-witness issue is raised by the evidence. *Id.*

When an instruction is mandated by statute and the defendant neither requests its inclusion in the charge nor objects to its omission, the trial court's error in failing to give the required instruction is not waived, but a higher level of harm is required for reversal. *Id.* at 165 (citing *Almanza v. State,* 686 S.W.2d 157 (Tex.Crim.App.1985) (op. on reh'g), *superseded on other grounds by rule as stated in Rodriguez v. State,* 758 S.W.2d 787, 788 (Tex.Crim.App.1988)). If a criminal defendant timely objects to an erroneous charge, then we will reverse if the error was calculated to injure his rights, or stated differently, if the error caused the defendant "some harm." *Almanza,* 686 S.W.2d at 171. But if the defendant failed to object, we will reverse only if the error has caused egregious harm such that it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory. *Olivas v. State,* 202 S.W.3d 137, 144 (Tex.Crim.App.2006). In effect, egregious harm deprives a defendant of a fair and impartial trial. *Neal v. State,* 256 S.W.3d 264, 278 (Tex.Crim.App. 2008). We therefore apply this stricter standard of review in analyzing the harm to appellant from the trial court's error.

## B. The trial court's error egregiously harmed appellant.

A defendant is egregiously harmed by the trial court's omission of an

accomplice-witness instruction if a rational jury "would have found the corroborating evidence so unconvincing in fact as to render the State's overall case for conviction clearly and significantly less persuasive." *Saunders v. State*, 817 S.W.2d 688, 692 (Tex.Crim.App.1991). We consider the extent of any harm "in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Id.* at 690 (quoting *Almanza*, 686 S.W.2d at 171).

To measure the sufficiency of the corroborating evidence, we eliminate all of the accomplice evidence from the record and determine if the remaining inculpatory evidence tends to connect the appellant to the offense. *Malone v. State*, 253 S.W.3d 253, 257 (Tex.Crim.App.2008). Such evidence may be direct or circumstantial. *Munoz v. State*, 853 S.W.2d 558, 559 (Tex.Crim.App.1993). In evaluating the non-accomplice evidence, we consider its reliability and the strength of its tendency to connect the defendant to the crime. *Herron*, 86 S.W.3d at 632. Corroborating evidence is reliable if "there is no rational and articulable basis for disregarding it or finding that it fails to connect the defendant to the offense." *Id.* at 633. We evaluate the sufficiency of non-accomplice evidence in light of the particular facts and circumstances of each case. *Smith*, 332 S.W.3d at 442. The corroborating evidence required when we are reviewing for egregious harm need not be as strong as would be required if we were reviewing only for "some harm." *Herron*, 86 S.W.3d at 633.

After considering the entire record and deferring to the jury's view of the facts, *see Smith*, 332 S.W.3d at 442, we agree with appellant that the non-accomplice evi-

dence is so weak that he was egregiously harmed by the trial court's failure to instruct the jury on the corroboration requirement. Aside from the accomplice testimony, the only evidence that tends to connect appellant to the offense is the fact that, several hours after the offense and in the company of two of the other accomplices, appellant was one of three black men asleep at Coleman and Roberts's apartment, where police found physical evidence that could be connected circumstantially to the robbery. None of the physical evidence, however, is linked to appellant.

On a couch in the living room, police found "some pieces of cloth, possibly of a shirt." These were found in the common area of the apartment belonging to the two accomplices who confessed to the robbery. *See Biera v. State*, 280 S.W.3d 388, 396 (Tex.App.-Amarillo 2008, pet. ref'd) (reversing conviction where the only non-accomplice evidence were masks found in an apartment that the confessed robber also occupied). Although Jonathan's wallet was found on the back of the couch, no property identified with appellant was found on the couch or anywhere else in the apartment. There was no non-accomplice evidence that the muddy clothes, shoes, and gun found in the apartment belonged to or were ever used by appellant, who was a guest, rather than to Roberts, who resided there.

The State correctly points out that, if accompanied by other suspicious circumstances, evidence that the accused was at or near the crime scene around the time of the offense may tend to connect the accused to the crime. *Romero v. State*, 716 S.W.2d 519, 522 (Tex.Crim.App.1986). According to the State, appellant's presence at Coleman and Robert's apartment several hours after the robbery is a suspicious circumstance because (1) it is near the scene of the crime, (2) an accomplice rent-

ed it, and (3) "it appeared to have been forcibly entered and was possibly the scene of a criminal trespass or burglary of a habitation." We disagree.

Although the apartment complex where Coleman and Roberts lived was less than a half-mile from the convenience store where the robbery occurred, the complaint shows that appellant lived in the same apartment complex. *Compare Walker v. State*, 615 S.W.2d 728, 733 (Tex.Crim.App.1981) (testimony that defendant and accomplice were together at a gas station at or after midnight and approximately three hours before the crime "must be considered in light of the fact that both the appellant and [the accomplice] lived in the ... vicinity") *with Burks v. State*, 876 S.W.2d 877, 888 & n. 12 (Tex.Crim.App.1994) (pointing out that appellant, who lived near the crime scene, was not merely nearby, but also was seen an hour earlier in a vehicle similar or identical to one observed at the crime scene and was looking for bullets of the same caliber extracted from the deceased). Thus, appellant's proximity to the crime scene does not tend to connect him to the robbery.

█ We also cannot agree that appellant's presence at the accomplices' apartment is a suspicious circumstance tending to connect appellant to the offense. The "mere presence of the accused in company with the accomplice witness shortly before or after the time of the offense is not, in itself, sufficient corroboration." *Harris v. State*, 738 S.W.2d 207, 218 (Tex.Crim.App. 1986). The State does not explain why a different rule should apply when the accused was in the accomplices' presence at an accomplice's home, rather than, for example, in the accomplice's vehicle, at the home of an accomplice's relative, or at the

defendant's own home. *Cf. Thomas v. State*, 166 Tex.Crim. 331, 333–34, 313 S.W.2d 311, 312–13 (1958) (reversing conviction because corroborating evidence showed only that appellant left a bar with accomplice in accomplice's truck while deceased followed); *Gaston v. State*, 324 S.W.3d 905 (Tex.App.-Houston [14th Dist.] 2010, pet. ref'd) (reversing conviction where corroborating evidence showed only that appellant was with accomplice at home of accomplice's sister, borrowed the sister's car, and returned with a large number of five-dollar bills); *Etheredge v. State*, 542 S.W.2d 148, 150 (Tex.Crim.App. 1976) (reversing conviction for unlawful delivery of drugs because corroborating evidence showed only that buyer went into appellant's house with money, came out with drugs, and was followed outside by appellant, who stood on the porch speaking with the buyer).

█ The State also argues that Coleman's apartment was a "suspicious place"—and hence, appellant's presence there was a suspicious circumstance—because when police arrived, they observed that the living-room window was partially open and the blinds were crushed. Such evidence does not tend to connect appellant, even indirectly, to the robbery. At trial, Coleman testified that she had lost Roberts's key to the apartment, and Roberts testified that after the robbery, he and the Freeman brothers entered the apartment through the window. But, evidence that merely corroborates what the accomplice said the participants did, but which does not tend to connect the accused to the offense, is not sufficient. *See Walker*, 615 S.W.2d at 732 (stating that such evidence cannot be considered).[2] Corrobo-

2. Although the State asserts on appeal that the apartment "appeared to have been forcibly entered and was possibly the scene of a

criminal trespass or burglary of a habitation," no one testified that the window appeared to have been forced; that police considered the

rating evidence need not provide a direct link to the crime, but it must tend to connect the defendant in some way to the charged offense. *Id.*

The evidence tending to link appellant to the offense appears to consist almost entirely of the fact that he was one of three black men at Coleman's apartment several hours after the robbery. The prosecutor stated in closing argument that police officers who went to Coleman's apartment found "[t]hree black males, same build, same height as the three males Joe Gonzales saw run out of the store." The record does not show that Gonzales or anyone else described for police how the three perpetrators were built. Seth specifically denied that police ever asked for such a description, but testified that he believed they were black based on the sound of their voices. Gonzales described the suspects' clothing and a gun, but he did not describe the suspects' race, height, weight, or body type. Arredondo testified that three men exited the gold car, but like Gonzales, she did not describe their race, height, weight, or anything about the physique of any suspect. And although witnesses described the clothing that the offenders were wearing, appellant's clothing did not match the description. Evidence that the accused was in the accomplice's presence around the time of the offense is not sufficient corroboration, and that rule is no less true when the accused is of the same race as the offender. *See Gaston,* 324 S.W.3d at 911 (rejecting argument that accomplice testimony was corroborated because the jury could compare the appellant's physique to the masked person in a surveillance video where the person on the video was completely covered but for a portion of his neck that was exposed, revealing his skin color); *see also Fernandez v. State,* 989 S.W.2d 781, 783, 786 (Tex. App.-San Antonio 1998, pet. ref'd) (testimony about offender's height, build, skin color, and accent did not corroborate accomplice testimony where the description could match "hundreds or thousands of other men in the area").

Citing a number of cases from the Court of Criminal Appeals, the State maintains that the evidence of suspicious circumstances in this case, when added to appellant's association with the accomplices, tend to connect him to the crime. *See, e.g., McDuff v. State,* 939 S.W.2d 607, 611–12 (Tex.Crim.App.1997); *Dowthitt v. State,* 931 S.W.2d 244, 249–50 (Tex.Crim.App. 1996); *Reed. v. State,* 744 S.W.2d 112, 126–28 (Tex.Crim.App.1988); *Cockrum v. State,* 758 S.W.2d 577, 581–82 (Tex.Crim. App.1988); *Harris v. State,* 738 S.W.2d 207, 218–19 (Tex.Crim.App.1986); *Edwards v. State,* 427 S.W.2d 629, 633 (Tex. Crim.App.1968). These cases, however, are not analogous to the one before us.

The evidence in this case is far weaker than that of *McDuff v. State.* In that case, witnesses saw a vehicle being driven the wrong way down a one-way street, heard a woman's scream from a car wash, and within minutes, saw the accused leave the car wash by driving a vehicle the wrong way on a one-way street. *McDuff,* 939 S.W.2d at 611. Other witnesses testified that the defendant was seen pushing his vehicle to a motel parking lot where it was abandoned. *Id.* Investigators found human blood inside the vehicle, as well as

appearance of the window suspicious; or that the apartment was thought to be the possible scene of a criminal trespass or burglary. To the contrary, Detective Thomas Helgoth testified that police were looking for the three suspects who ran into the woods. He and

two other officers went to the apartment because they were told that an accomplice to the robbery lived there, and through the window, officers saw three black men asleep inside.

five hairs that microscopically matched the murder victim's hair. *Id.* Finally, the defendant was arrested in another state where, using an alias, he worked and had checked into a shelter for the homeless. *Id.* at 612.

As in *McDuff*, there was a wealth of evidence in *Dowthitt v. State* that tended to connect the criminal defendant to the offense. *See Dowthitt*, 931 S.W.2d at 249–50. Among other things, the defendant admitted his presence at the crime scene during the murder; he had blood on his shirt; his fingerprints and the victim's blood were found on a bottle on the defendant's premises; and one of the defendant's children recognized that the knife used in the murder belonged to the defendant. *Id.*

*Reed v. State* also is unlike the present case. The accused in *Reed* was having an affair and told others that he planned to "get rid of" his wife. *Reed*, 744 S.W.2d at 126–27. He admitted he was at the crime scene during his wife's murder, but medical evidence contradicted his claim that he was unconscious. *Id.* at 127. There was evidence that intruders could not have entered through the means that the accused suggested. *Id.* at 128. There also were a number of inconsistencies in the accused's version of events. *See id.* at 127–28.

*Cockrum*, *Edwards*, and *Harris* are similarly distinguishable. The defendant in *Cockrum* was seen with the accomplice immediately before and after the crime; listened intently to a police scanner while staring down the road; had a gun similar to that used in the offense; arranged to have someone drive him to another state when he saw police at the accomplice's ranch; checked into a hotel under an assumed name; and had over $1,000 in his possession even though he was unemployed. *Cockrum*, 758 S.W.2d at 581–82. In addition to being with the accomplice

near the scene of the crime at around the time of the offense, the criminal defendant in *Edwards* fled after the crime and accompanied the accomplice to a pawn shop where the accomplice attempted to trade the murder victim's gun. *Edwards*, 427 S.W.2d at 633. And in *Harris*, the criminal defendant and two other men had the deceased's gun about an hour after the murder, and when arrested the next morning, the defendant had human blood on his shoes. *Harris*, 738 S.W.2d at 218–19.

Unlike the precedential cases cited by the State, there is no forensic evidence in this case, and no non-accomplice evidence that appellant was at or near the scene of the crime around the time of the offense, fled after the crime, or possessed stolen property. No corroborating evidence places appellant in the company of any accomplice before, during, or for several hours after the crime. No non-accomplice evidence places appellant any nearer or farther from the crime scene than his own home. The perpetrators stole money, cigars, and cigarettes, but there is no corroborating evidence that appellant possessed any such items. His clothing did not match descriptions of the clothing worn by those who committed the crime, and police characterized his behavior as cooperative. But, despite the dearth of corroborating evidence, the prosecutor focused almost entirely on Coleman and Roberts's testimony during closing argument.

On this record, we believe rational jurors would have found the State's case "significantly less persuasive" had they been properly instructed that they could not convict appellant based on Coleman and Roberts's testimony absent other evidence tending to connect appellant to the robbery. Because we conclude that appellant was egregiously harmed by the trial court's failure to instruct the jury on the

need for corroborating evidence, we sustain appellant's sole issue on appeal.

We accordingly reverse appellant's conviction and remand the case for a new trial.