

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-19-00106-CR

SAMANTHA NICOLE WOHLFORD, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 276th District Court
Camp County, Texas
Trial Court No. CF-15-1524

Before Morriss, C.J., Burgess and Stevens, JJ.
Memorandum Opinion by Justice Burgess

# MEMORANDUM OPINION

Ernest Lee Ibarra, Jr., was beaten, abducted from his home, and murdered by three men during the early morning hours of February 20, 2015. Ibarra's wife, Samantha Nicole Wohlford, was subsequently charged with murder as a party to the offense, was convicted by a Camp County jury, and was sentenced to ninety-nine years' imprisonment. On appeal, Wohlford complains that the trial court erred (1) in giving the jury a defective party-liability instruction; (2) in failing to instruct the jury that Jonathan Sanford, one of the three men involved in Ibarra's kidnapping and murder,[1] was an accomplice witness as a matter of law; and (3) in failing to include a jailhouse-witness instruction in its jury charge. Because we find that any defect in the party-liability instruction was invited error, the trial court's error in failing to give a proper accomplice-witness instruction was harmless, and the trial court's failure to sua sponte instruct the jury on jailhouse-witness testimony was also harmless, we affirm the trial court's judgment.

## I. Did the Trial Court Give A Defective Instruction Regarding Party Liability?

In her first point of error, Wohlford contends that the trial court committed reversible error in giving a defective jury instruction regarding party liability by including the following sentence: "Mere presence alone will not constitute one a party to an offense." We disagree.

### A. Standard of Review

We employ a two-step process in our review of alleged jury charge error. *See Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994). "Initially, we determine whether error occurred and then evaluate whether sufficient harm resulted from the error to require reversal."

---

[1]The three men were Sanford; Sanford's brother-in-law, Jose Ponse; and Sanford's friend, Octavious Rhymes.

*Wilson v. State*, 391 S.W.3d 131, 138 (Tex. App.—Texarkana 2012, no pet.) (citing *Abdnor*, 871 S.W.2d at 731–32). In deciding a question of alleged charge error, we begin with the proposition that "the jury is the exclusive judge of the facts, but it is bound to receive the law from the court and be governed thereby." TEX. CODE CRIM. PROC. ANN. art. 36.13. Accordingly, "[a] trial court must submit a charge setting forth the 'law applicable to the case.'" *Lee v. State*, 415 S.W.3d 915, 917 (Tex. App.—Texarkana 2013, pet. ref'd) (quoting TEX. CODE CRIM. PROC. ANN. art. 36.14). "The purpose of the jury charge . . . is to inform the jury of the applicable law and guide them in its application. It is not the function of the charge merely to avoid misleading or confusing the jury: it is the function of the charge to lead and prevent confusion." *Id.* (quoting *Delgado v. State*, 235 S.W.3d 244, 249 (Tex. Crim. App. 2007)).

### B. Analysis

A person is criminally responsible as a party to the offense, pursuant to Section 7.01 of the Texas Penal Code, if she commits an offense "by [her] own conduct, by the conduct of another for which [she] is criminally responsible, or by both." TEX. PENAL CODE ANN. § 7.01(a). "Each party to an offense may be charged with the commission of the offense." TEX. PENAL CODE ANN. § 7.01(b). As applicable in this case, "A person is criminally responsible for an offense committed by the conduct of another if[,] . . . acting with intent to promote or assist the commission of the offense, [she] solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." TEX. PENAL CODE ANN. § 7.02(a)(2).

The trial court's submitted instruction stated, in pertinent part,

> A person is criminally responsible as a party to an offense if the offense is committed by his or her own conduct, by the conduct of another for which he or she is criminally responsible, or by both.
>
> Each party to an offense may be charged with the commission of the offense.
>
> A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he or she solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense.
>
> Mere presence alone will not constitute one a party to an offense.

Wohlford contends that the trial court erred by including the last sentence because it "is simply not applicable to the case at bar. The defendant was not present when her husband was shot and the evidence is equivocal as to whether she knew that such activity would happen."

Yet, Wohlford's proposed jury charge also included the instruction that "[a] defendant's mere presence alone will not make him responsible for an offense." "The law of invited error provides that a party cannot take advantage of an error that it invited or caused, even if such error is fundamental." *Woodall v. State*, 336 S.W.3d 634, 644 (Tex. Crim. App. 2011). Because Wohlford asked the trial court to include a sentence that was essentially the same one included in the charge, she is estopped from complaining of its inclusion on appeal. *See Prytash v. State*, 3 S.W.3d 522, 531 (Tex. Crim. App. 1999). Therefore, we overrule this point of error.

4

**II.     Did the Trial Court Err in Failing to Give an Accomplice-Witness Instruction?**

In her second point of error, Wohlford contends that the trial court erred in failing to give a proper accomplice-witness instruction.[2]   Wohlford argues that the trial court committed reversible error in failing to instruct the jury that Sanford was an accomplice as a matter of law.[3] The State concedes that the trial court erred, but argues that such error was harmless.  We agree with the State.

**A.     Standard of Review**

We review an alleged error related to an accomplice-witness instruction under the procedural framework of *Almanza*.[4]  *Zamora v. State*, 411 S.W.3d 504, 512 (Tex. Crim. App. 2013) (citing *Casanova v. State*, 383 S.W.3d 530, 533 (Tex. Crim. App. 2012); *Herron v. State*, 86 S.W.3d 621, 631–32 (Tex. Crim. App. 2002); *Medina v. State*, 7 S.W.3d 633, 642 (Tex. Crim. App. 1999)).  Under this framework, we employ a two-step process in our review of the alleged error. *See Abdnor*, 871 S.W.2d at 731.  "Initially, we determine whether error occurred and then evaluate whether sufficient harm resulted from the error to require reversal."  *Wilson v. State*, 391 S.W.3d 131, 138 (Tex. App.—Texarkana 2012, no pet.) (citing *Abdnor*, 871 S.W.2d at 731–32). In examining the charge for possible error, appellate courts "must examine the charge as a whole instead of a series of isolated and unrelated statements."  *Vasquez v. State*, 389 S.W.3d 361, 366

---

[2]Wohlford did not object or request additional instructions to the jury charge at trial.

[3]Sanford had previously been convicted of the aggravated kidnapping and murder in connection with Ibarra's abduction and subsequent death.

[4]*Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g).

(Tex. Crim. App. 2012) (quoting *Dinkins v. State*, 894 S.W.2d 330, 339 (Tex. Crim. App. 1995)). Only if we find error do we analyze that error for harm. *See Abdnor*, 871 S.W.2d at 731.

**B.      The Trial Court Erred in Failing to Give an Accomplice-Witness Instruction**

Sanford participated in and was convicted of the aggravated kidnapping and murder of Ibarra. Therefore, he was an accomplice as a matter of law. *See Hall v. State*, 161 S.W.3d 142, 149 (Tex. App.—Texarkana 2005, pet. ref'd). "If a witness is an accomplice as a matter of law, the trial court is required to provide an accomplice-witness instruction to the jury." *Cocke v. State*, 201 S.W.3d 744, 748 (Tex. Crim. App. 2006). The instruction must explain the definition of an accomplice and inform the jury that the witness is an accomplice as a matter of law. *Zamora*, 411 S.W.3d at 509. It must also instruct the jury regarding the requirements of Article 38.14. *See* TEX. CODE CRIM. PROC. ANN. art. 38.14; *Zamora*, 411 S.W.3d at 509.

If a State witness is an accomplice as a matter of law, the trial court has a duty to instruct the jury accordingly, and the failure to do so is error. *Herron v. State*, 86 S.W.3d 621, 631 (Tex. Crim. App. 2002). In this case, although the trial court instructed the jury regarding the requirements of Article 38.14, it failed to include the definition of an accomplice and to identify Sanford as an accomplice as a matter of law. Therefore, we find that the trial court erred in failing to give a proper accomplice-witness instruction.

**C.      The Trial Court's Error Was Harmless**

**1.      Applicable Law and Harmless Error Standard of Review**

Having found error, we must determine whether Wohlford was harmed by the trial court's omission. "Where the evidence clearly shows a witness is an accomplice as a matter of law, the

6

trial court must so instruct the jury, but if the appellant fails to object to the omission of the instruction, as in [Wohlford's] case, he or she must prove egregious harm to prevail on appeal." *Hall*, 161 S.W.3d at 149.

Article 38.14 provides, "A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." TEX. CODE CRIM. PROC. ANN. art. 38.14. The purpose of this instruction is to inform "the jury that it cannot use the accomplice witness testimony unless there is also some non-accomplice evidence connecting the defendant to the offense." *Herron*, 86 S.W.3d at 632. Generally, in an egregious-harm analysis, "non-accomplice evidence can render harmless a failure to submit an accomplice witness instruction by fulfilling the purpose an accomplice witness instruction is designed to serve." *Id.* However, there may be harm if "the corroborating (nonaccomplice) evidence is 'so unconvincing in fact as to render the State's overall case for conviction clearly and significantly less persuasive.'" *Hall*, 161 S.W.3d at 150 (quoting *Herron*, 86 S.W.3d at 632).

To evaluate the sufficiency of corroboration evidence, we eliminate the accomplice-witness testimony from consideration and examine the nonaccomplice evidence "to ascertain if there is evidence which tends to connect the accused with the commission of the offense." *Hernandez v. State*, 939 S.W.2d 173, 176 (Tex. Crim. App. 1997) (citing *Reed v. State*, 744 S.W.2d 112, 125 (Tex. Crim. App. 1988)); *Burks v. State*, 876 S.W.2d 877, 887 (Tex. Crim. App. 1994); *Hall*, 161 S.W.3d at 150. The nonaccomplice evidence need not establish guilt beyond a

reasonable doubt or directly link the defendant to the crime. *Hernandez*, 939 S.W.2d at 176; *Gill v. State*, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994). Rather, "[t]he accomplice witness rule is satisfied if there is *some* non-accomplice evidence which *tends* to connect the accused to the commission of the offense alleged in the indictment." *Hernandez*, 939 S.W.2d at 176 (citing *Gill*, 873 S.W.2d at 48 (citing *Gosch v. State*, 829 S.W.2d 775, 777 (Tex. Crim. App. 1991); *Cox v. State*, 830 S.W.2d 609, 611 (Tex. Crim. App. 1992))). Evidence placing the defendant "in the company of the accomplice at or near the time or place of the offense is proper corroborating evidence." *McDuff v. State*, 939 S.W.2d 607, 613 (Tex. Crim. App. 1997) (citing *Cockrum v. State*, 758 S.W.2d 577, 581 (Tex. Crim. App. 1988); *Burks*, 876 S.W.2d at 887–88). Further, "[i]n determining the strength of the particular item of nonaccomplice evidence, we must examine (1) its reliability or believability, and (2) the strength of its tendency to connect the defendant to the crime." *Hall*, 161 S.W.3d at 150 (citing *Herron*, 86 S.W.3d at 632).

### 2. Sanford's Testimony

At trial, the State relied on Sanford's testimony for the details of the kidnapping and murder of Ibarra.[5] Sanford testified that he met Wohlford in February 2015, around Valentine's Day, and that he had been to her house two or three times prior to the night of the murder. Wolhford told Sanford that Ibarra was abusive, and Sanford offered to take care of Ibarra for her. When Sanford told her that he and Rhymes could take Ibarra out of the picture, she asked how that would be done.

---

[5]Although our harmless-error analysis requires us to disregard the accomplice-witness testimony, we recite it here so that we can determine whether the nonaccomplice-witness evidence sufficiently corroborates the accomplice's testimony.

Sanford originally proposed seting up Ibarra for a drug-related conviction by planting methamphetamine in his vehicle. Wohlford agreed with that proposal. In order to carry out that plan, Sanford, Rhymes, Wohlford, and her children traveled to Mount Vernon to purchase methamphetamine from Rhymes's cousin. During the trip, Sanford was driving Wohlford's car.

After completing the purchase that night, they returned to Rhymes's house in Pittsburg. However, later that evening, Sanford told Wohlford that he could get rid of Ibarra for good, and if that is what she wanted, all she had to do was leave the door to her house unlocked. Sanford testified that although Wohlford agreed with this new suggestion, he did not think she understood that he planned to kill Ibarra.

Pursuant to the new plan, Sanford and Rhymes took Wohlford and her children back to her house about 12:00 a.m. They removed the children's car seats from her vehicle and put them on her front porch and then took the vehicle to Wal-Mart to purchase gloves. They then picked up Ponse, who had the gun they planned to use, and they smoked the methamphetamine they had bought to plant on Ibarra on the way back to Wohlford's house. When they arrived at the house, the front door was unlocked, and the men proceeded upstairs to Wohlford and Ibarra's bedroom. Rhymes took Wohlford downstairs, and Sanford and Ponse began beating and pistol-whipping Ibarra.

Sanford and Ponse then took Ibarra downstairs. After further beating Ibarra, Sanford and Ponse took him outside and searched his truck. Sanford testified that when he went back upstairs, he saw Wohlford on the bed, holding her phone. She was not tied up. Wohlford told him that she had called her mother, so Sanford went back downstairs and told Rhymes and Ponse that they

9

needed to leave. In order to give the appearance of a forced entry, Sanford damaged the front door. Sanford then detailed how they placed Ibarra into Wohlford's car and they drove it to a remote location, where Ponse shot Ibarra in the head.

### 3. The Nonaccomplice Evidence

Wohlford admitted that she wanted to harm Ibarra in the past, that she had previously complained about Ibarra to other men, and that she indicated to them that she wanted to be rid of him. David Smith testified that in the time he had known Ibarra and Wohlford, he had heard Wohlford say that she wanted Ibarra out of her life and out of her family. Jeremy Rule testified that he had known the couple for years and that from time to time, Wohlford would say something about wanting to get rid of Ibarra or wanting to have harm done to him.

Bret Webster, who was the boyfriend of Wohlford's aunt, Ginger Kesterson, testified that Wohlford's mother called him in the early morning hours of February 20 and asked him to go to Wohlford's house because something was happening. Webster picked Kesterson up on his way to Wohlford's house. When they arrived, they found the front door damaged, Wohlford tied up on the bedroom floor, and Wohlford's five children all asleep in a nearby bedroom. Webster also testified that Wohlford's children had stayed with him two nights before the kidnapping and murder and that Wohlford had told him a man named Johnathan would pick the children up in her vehicle. Webster testified that those events occurred just as Wohlford had described them.

Kesterson testified that when she and Webster arrived at Wohlford's house, Wohlford's legs were tied, her mouth was gagged, and her hands were tied behind her back. After untying Wohlford, Kesterson saw Wohlford's phone in her lap. She asked Wohlford how she had called

10

for help, and Wohlford told her that she had used her nose to call the last person called, her mother. When she asked her where her vehicle was, Wohlford told her it was not supposed to be there. Kesterson also testified that it was out of the ordinary for all the children to be asleep in one room together.

Ponse's girlfriend, Lacona Slaton, testified that she met Wohlford at the hospital the day before Ibarra was murdered. Sanford, Rhymes, Ponse, and Wohlford's children were also at the hospital at the time. Slaton testified that she, Sanford, Rhymes, Ponse, Wohlford, and Wohlford's children all went to Wal-Mart so Wohlford could visit Sanford's girlfriend, Sharla. After leaving Wal-Mart, Sanford dropped Ponse and Slaton off at Rhymes's house. Slaton testified that on several occasions during that evening, Rhymes and Wohlford would leave the room and whisper to each other. At one point, Sanford asked Wohlford about her kids, and Wohlford said she could give them something to put them to sleep fast. Later, Sanford and Rhymes took Wohlford and her children back to her house.

Titus County Sheriff's Deputy Chris Durant testified that he responded to the 9-1-1 call on the night of Ibarra's kidnapping. Among other things, Durant testified that he learned the perpetrators had taken Ibarra's cell phone. After he obtained the telephone number, he asked the department's communications officer to "ping" it to determine its location. He testified that Wohlford was standing near him when he spoke with the communications officer and that she asked if she could step outside and call her mother. According to Durant, his call to the communications officer occurred at approximately 2:30 a.m.

11

Cell phone records and forensic testimony revealed that approximately one minute after Durant's call to the sheriff's communications officer, a text message was sent from Wohlford's phone to Rhymes's phone number. The text instructed Rhymes to turn Ibarra's phone off and get rid of it. About the same time as that text message, Rhymes's phone connected to a cell tower near the location where Ibarra's body was found. Around 3:17 a.m., Durant learned that law enforcement had located the cell phone. Durant said that he told Wohlford of that development as well. Durant testified that Wohlford's cell phone records indicated that approximately one minute after that conversation occurred, a text message was transmitted from Wohlford's phone to Rhymes, stating, "Ditch phone, move."

Chris Bragg, an investigator for the Titus County Sheriff's Office, testified that he interviewed Wohlford both at her residence and at the sheriff's office. He was suspicious of Wohlford's version of events. In particular, Bragg said that although her front door was damaged, the damage was not consistent with a break-in because the door frame and security chain were still intact. In addition, Wohlford claimed that the intruders slapped her, pulled out her hair, and put a knife to her throat, but an officer on the scene testified that he did not see injuries consistent with her claims. Bragg also stated that Wohlford continually maintained that she did not know who broke in and abducted Ibarra, but later that morning, she admitted she knew the men and identified them as Sanford, Rhymes, and Ponse.

### 4. Analysis

Eliminating Sanford's testimony and considering only the nonaccomplice evidence, we find that there was some evidence that tends to connect Wohlford to the commission of the offense.

12

Slaton's testimony placed Wohlford in the company of Sanford, Rhymes, and Ponse for a significant portion of the day and evening before Ibarra's kidnapping and murder. In addition, her testimony established that Wohlford discussed kidnapping Ibarra from the house, agreed to assist the perpetrators by ensuring that her children were out of the way and fast asleep, and agreed to allow them to use her vehicle. Further, cell phone records and forensic testimony established that Wohlford shared critical information with Rhymes during the investigation via text messages to help the perpetrators avoid capture. This evidence also demonstrated that Wohlford deleted the messages in an apparent attempt to hide her involvement. Finally, although Wohlford knew the identities of Ibarra's kidnappers, she kept that information from law enforcement for hours before finally disclosing it. This evidence tends to show that Wohlford was actively involved in Ibarra's kidnapping and murder.

Because there is some evidence that tends to connect Wohlford to the commission of the aggravated kidnapping, the purpose of a proper accomplice-witness instruction was fulfilled. Therefore, we find that the error by the trial court was harmless. *See Herron*, 86 S.W.3d at 632. We overrule Wohlford's second point of error.

## IV. Did the Trial Court Err in Failing to Give a Jailhouse-Witness Instruction?

In her final point of error, Wohlford argues that the State's witness, Whitney Smith, was a jailhouse witness and that the trial court was required to include a jailhouse-witness instruction in its charge under Article 38.075 of the Texas Code of Criminal Procedure. *See* TEX. CODE CRIM. PROC. ANN. art. 38.075(a) (Supp.). Because the trial court failed to do so, Wohlford argues that the trial court committed reversible error. We disagree.

13

## A.     Did the Trial Court Err?

### 1.     Applicable Law and Standard of Review

Section 38.075(a) provides, in relevant part:

> A defendant may not be convicted of an offense on the testimony of a person to whom the defendant made a statement against the defendant's interest during a time when the person was imprisoned or confined in the same correctional facility as the defendant unless the testimony is corroborated by other evidence tending to connect the defendant with the offense committed.

*Id.* The Texas Court of Criminal Appeals has held that testimony from a jailhouse witness "is inherently unreliable due to the inmate's incentive to better [her] circumstances." *Phillips v. State*, 463 S.W.3d 59, 66 (Tex. Crim. App. 2015). Consequently, "Article 38.075 was enacted in recognition that incarcerated individuals have an incentive to provide information against other incarcerated individuals and that this testimony should be corroborated." *Id*.

Because a trial court is required to sua sponte instruct the jury on the "law applicable to the case," it is error for the trial court not to include a jailhouse-witness instruction when the requirements of Article 38.075 are met. *Id*. at 65 (quoting *Oursbourn v. State*, 259 S.W.3d 159, 180 (Tex. Crim. App. 2008)). Yet, a trial court is only required to give a jailhouse-witness instruction when the record shows that the requirements of Article 38.075 have been met. *See Oursbourn v. State*, 259 S.W.3d 159, 180 (Tex. Crim. App. 2008) ("If the evidence raises [the] issue . . . , then the trial court shall instruct the jury [whatever the statute or rule requires].").

### 2.     Analysis

Smith testified that after February 20, 2015, she "spent some time with Samantha Wohlford" while they were in the same dorm together in the Titus County jail and that they talked

14

about the death of Wohlford's husband. According to Smith, Wohlford said that she could beat the case if she could get rid of a text message that she sent to the guys who had kidnapped her husband, instructing them to get rid of his phone. Smith said that Wohlford told her that she thought she had deleted the text messages from her phone.

This testimony satisfies the requirements of Article 38.075(a) because Smith testified regarding statements against interest that Wohlford made to her while they were both imprisoned or confined in the same correctional facility. *See* TEX. CODE CRIM. PROC. ANN. art. 38.075(a). Therefore, the trial court was required to give the jury a jailhouse-witness instruction, and it erred by failing to do so. *See Phillips*, 463 S.W.3d at 65.

### B. Was the Trial Court's Error Harmful?

#### 1. Applicable Law and Harmless Error Standard of Review

Article 38.075 does not require the jury to be skeptical of inmate-witness testimony; nor does it require the jury to give less weight to such testimony than to other evidence. *See* TEX. CODE CRIM. PROC. ANN. art. 38.075 (Supp.); *Herron*, 86 S.W.3d at 632. Rather, an Article 38.075 instruction "merely informs the jury that it cannot use the . . . testimony unless there is also some [independent] evidence connecting the defendant to the offense." *Herron*, 86 S.W.3d at 632; *see* TEX. CODE CRIM. PROC. ANN. art. 38.075. "Once it is determined that such . . . evidence exists, the purpose of the instruction is fulfilled, and the instruction plays no further role in the fact[-]finder's decision-making." *Herron*, 86 S.W.3d at 632. Therefore, the existence of corroborating evidence "tending to connect" appellant to the offense can "render harmless" a trial

15

court's failure to submit an Article 38.075 instruction by fulfilling the purpose that such an instruction is designed to serve. *See id*. at 631–62.

To resolve this issue, we eliminate all of Smith's testimony regarding appellant's statements and "determine if the remaining inculpatory evidence tends to connect appellant to the offense." *Freeman v. State*, 352 S.W.3d 77, 83 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd) (citing *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008)). A harmless-error analysis for the omission of an Article 38.075 witness instruction is flexible and takes into account the existence and strength of such corroborating evidence and the applicable standard of harm. *See Herron*, 86 S.W.3d at 632. "In determining the strength of [corroborating] evidence, we examine (1) its reliability or believability and (2) the strength of its tendency to connect the defendant to the crime." *Id*. Under *Almanza*, when, as here, the defendant has failed to preserve error, we only reverse for egregious harm. *Almanza*, 686 S.W.2d at 171 (op. on reh'g). Under the egregious harm standard, the omission of an Article 38.075 instruction is generally harmless unless the corroborating evidence is "so unconvincing in fact as to render the State's overall case for conviction clearly and significantly less persuasive." *Herron*, 86 S.W.3d at 632 (quoting *Saunders v. State*, 817 S.W.2d 688, 692 (Tex. Crim. App. 1991)).

### 2. Analysis

We have previously analyzed the reliability and strength of the corroborating evidence in this case in our analysis of Wohlford's previous point of error. As we noted there, strong and reliable nonaccomplice evidence tends to connect Wohlford to the offense. Just as this evidence rendered the trial court's failure to give an accomplice-witness instruction harmless, it renders the

16

failure to give a jailhouse-witness instruction harmless as well. Accordingly, the trial court's failure to give a jailhouse-witness instruction was harmless, and we overrule this point of error. *See id.*

**IV. Conclusion**

For the foregoing reasons, we affirm the trial court's judgment.


Ralph K. Burgess
Justice

Date Submitted:     November 7, 2019
Date Decided:       January 31, 2020

Do Not Publish